**In re 3DFX INTERACTIVE, INC., Debtor.**

**William A. Brandt, Jr., Trustee, Plaintiff,**

**v.**

**nVidia Corporation, a Delaware Corporation; et al., Defendants.**

**Bankruptcy No. 02–55795–RLE. Adversary No. 03–5079.**

United States Bankruptcy Court, N.D. California, San Jose Division.

April 30, 2008.

Aron M. Oliner, Law Offices of Duane Morris, Craig C. Chiang, Robert E. Izmirian, Buchalter, Nemer, Fields and Younger, Kim Arnone, Law Offices of Buchalter Nemer, San Francisco, CA, for Plaintiff.

Frederick D. Holden, Leah Nutting, Robert P. Varian, Ruth Kwon, Orrick, Herrington and Sutcliffe, San Francisco, CA, for Defendants.

**MEMORANDUM DECISION
AFTER TRIAL**

ROGER L. EFREMSKY, Bankruptcy Judge.

Before the Court is the First Amended Complaint (the "Complaint") filed by Wil- liam A. Brandt, Jr., the Trustee of the above-captioned chapter 11 estate of 3dfx Interactive, Inc. (the "Trustee" and "3dfx"), against nVidia Corporation and nVidia U.S. Investment Company (collec- tively, "nVidia") for avoidance of a fraudu- lent conveyance. This phase of the case has been tried and submitted for decision.

The Trustee is represented by Peter G. Bertrand, Richard C. Darwin and Kim Y. Arnone of Buchalter Nemer. nVidia is rep- resented by Robert P. Varian, Karen Johnson–McKewan and James N. Kramer of Orrick, Herrington & Sutcliffe LLP.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bank- ruptcy Procedure 7052.

## I. FACTS

### A. Procedural Background

#### 1. The Adversary Proceeding

3dfx filed this chapter 11 case on Octo- ber 15, 2002, and the Trustee was appoint- ed January 24, 2003. On February 24, 2003, the Trustee commenced this adver- sary proceeding.

The Complaint states four claims for relief based on California Civil Code §§ 3439.04(a) and (b) and § 3439.05 (Cali- fornia's Uniform Fraudulent Transfer Act (the "UFTA")), applicable here through Bankruptcy Code § 544(b)(1). The Trus- tee alleges that in the transaction between nVidia and 3dfx (the "Transaction") docu- mented in the Asset Purchase Agreement dated December 15, 2000 (the "APA"), nVidia paid less than reasonably equiva- lent value for what it received. nVidia re- sponded to the Complaint and the parties have engaged in extensive discovery.

In August 2005, the Trustee filed a motion for summary judgment which nVidia opposed. On December 22, 2005, the Court issued an order granting in part and denying in part the Trustee's motion (the "Summary Judgment Order"). Docket no. 172. The Summary Judgment Order provides that judicial estoppel precludes nVidia from asserting in this action that the "transaction value" is anything other than $108 million. The Court denied summary judgment regarding what specific assets were transferred in the Transaction and the value, if any, to be ascribed to them.

**2. The Questions to be Tried**

On January 26, 2007, the parties filed a Joint Statement of Legal and Factual Questions for Trial (the "Joint Statement"). Docket no. 237. On January 31, 2007, the Court issued a Pre–Trial Order establishing a schedule for trial and the manner in which this valuation phase of the trial would be handled. Docket no. 253. A timed trial took place between March 21, 2007 and April 5, 2007. Post-trial briefing is complete and the matter is ready for decision.

Pursuant to the Joint Statement and Pre–Trial Order, the issues to be determined at this phase of the case are:

In the Transaction:

1. What was transferred and/or surrendered by 3dfx to nVidia?

2. With respect to what was transferred and/or surrendered, what is subject to avoidance under applicable state and federal fraudulent transfer statutes?

3. With respect to what is identified in the answer to the second question, what was the fair market value as of the date it was transferred and/or surrendered?

4. Was the $70 million paid by nVidia reasonably equivalent to the fair market value identified in the answer to the third question?

**3. The Witnesses**

nVidia offered direct testimony by declarations from the following witnesses which were admitted into evidence:

1. Jen–Hsun Huang, president and chief executive officer of nVidia.

2. Christine Hoberg, former chief financial officer of nVidia.

3. Alex Leupp, former president and chief executive officer of 3dfx.

4. Phil Carmack, senior vice president of the handheld GPU business unit of nVidia, former vice president of hardware engineering at 3dfx and former executive vice president of research and development at 3dfx.

5. Paul D. Carmichael, former in-house counsel for nVidia.

6. Mark Maxson, a principal in the valuation practice at Deloitte & Touche.

7. Mark Waissar, former vice president at Morgan Stanley.

nVidia offered direct testimony by declarations and reports from the following expert witnesses which were admitted into evidence:

1. Roger J. Grabowski, regarding valuation issues.

2. Roman Weil, regarding accounting issues.

3. Jon G. Peddie, regarding graphics industry issues.

4. Charles D. Murphy, III, regarding investment banking issues.

5. Matthew R. Lynde, regarding patent damages issues.

The Trustee offered direct testimony by declarations and reports from the follow-

ing expert witnesses which were admitted into evidence:

1. Richard Ferraro, regarding industry issues.

2. Michael J. Wagner, regarding valuation issues.

The Trustee also offered testimony by designated deposition excerpts for Paul Carmichael, Richard Heddelson, Steve Pettigrew as part of his case-in-chief.

The Court heard testimony from nVidia's experts Messrs Weil, Peddie, and Murphy and from the Trustee's experts Messrs Ferraro and Wagner.

The Court also heard testimony from Jen–Hsun Huang, Christine Hoberg, Alex Leupp, Mark Maxson, and Richard Cording (the former controller of nVidia).

Designated deposition excerpts were also admitted into evidence. Before trial, both parties filed evidentiary objections to certain parts of the declarations and experts' reports. The Court ruled on these objections, in part, before trial began.[1] To the extent the Court relies upon any evidence for which there may have been a pending objection, any such objection is overruled.

## B. Background Regarding the Parties

### 1. The Brief Life of 3dfx

3dfx was a publicly traded semiconductor company incorporated in California in 1994. Its initial public offering took place in April 1997. 3dfx described itself as part of the world of "interactive electronic entertainment" that had started with coin-operated arcade games, then moved into home entertainment through the advent of inexpensive, dedicated home game consoles that attached to televisions and then progressed to games playable on personal computers. Ex. 5011, pp. 4–5.[2] 3dfx claimed that its products were used in more than 700 titles for personal computer games and more than 20 titles for arcade games. Game titles included *Everquest, Alien vs. Predator, Hydro Thunder,* and *Savage Quest.* Ex. 5011, p. 10.[3]

3dfx first shipped its graphics products (known as the Voodoo Graphics chipset) in September 1996 and introduced subsequent versions in 1997, 1998 and 1999 (with variations on the Voodoo name, such as the Voodoo 2, 3, 4, and 5, Voodoo Rush and Voodoo Banshee). 3dfx's target market had historically been the retail market for add-in graphics cards and 3dfx had devoted significant energy to establishing 3dfx and Voodoo as brand names in the retail market. Ex. 5011, pp. 6–8. At the time of the Transaction, Voodoo Rampage was in development but had not been completed. Voodoo Rampage had been "taped out" in early December 2000 but it could have been as much as another year before it would have been ready for commercial exploitation. RT 1503–1505 and 1319–1321.

### 2. 3dfx Merger with STB Systems, Inc.

Before May 1999, 3dfx was what is known as a "merchant chip" business—it designed and sold graphics chips to a variety of companies who then used the chips

---

1. *See* generally Docket nos. 311–344, 366, 372, 382

2. Well-known manufacturers of these game consoles include Sony Corporation, Nintendo Corporation, and Sega Enterprises, Ltd. Successive generations of these game consoles have been introduced for many years.

3. References to the reporter's transcript of trial proceedings will be as follows: "RT ____." References to Exhibits will be as follows: "Ex. ____."

in their own products. In May 1999, 3dfx completed its acquisition of STB Systems, Inc. ("STB"), a Texas based graphics board company with a manufacturing facility in Mexico. Ex. 5011, pp. 3, 14. The purpose of the 3dfx/STB merger was to allow 3dfx an avenue to deliver the 3dfx graphics chip directly to the retail/distributor market on a graphics board designed and built by 3dfx rather than on graphics cards designed by various third party companies. Ex. 5011, p. 3. The acquisition of STB fundamentally changed 3dfx's business strategy. Alex Leupp, former chief executive officer of 3dfx, characterized the STB acquisition as a "mistake." Ex. BV, ¶ 16.

Jon Peddie,[4] nVidia's industry expert, also described the STB merger as an ill-advised strategic decision:

> This change in 3dfx's business and product offerings brought it into direct competition with companies that had previously been major customers. Although this decision was intended to simplify the design process and shorten product cycles by putting its chips in a single board design ... 3dfx's transition from a merchant chip company to an add-in board company undermined 3dfx's customer relationships and reduced its sales.

Ex. BZ, ¶ 15.

Following the merger, certain operating functions of each company were combined in an attempt to achieve operating efficiency. Various engineering functions were merged to coordinate the graphics chip design process and graphics board design process. The sales and marketing operations were unified to address customer needs, particularly in the retail/distribution channel. Ex. 5011, p. 3. However, as a result of the merger, 3dfx lost two customers who had accounted for 58% of its total revenues for fiscal year 1998. 3dfx was unable to replace the lost revenues attributable to these two significant customers. STB revenues also declined after the merger because STB was unable to sell boards incorporating graphics chips from other companies. Ex. 5011, p. 21; Ex. BV, ¶¶ 5–6.

### 3. 3dfx Merger with Gigapixel Corporation

In July 2000, 3dfx completed a merger with Gigapixel Corporation ("Gigapixel"). One apparent rationale for this merger was to expand the number of engineers working for 3dfx. Gigapixel had about 40 graphics engineers at the time of the merger who became 3dfx employees. Ex. BV, ¶ 7. Mr. Leupp testified that the main purpose of 3dfx acquiring Gigapixel was Gigapixel's relationship with Microsoft and the X–Box (then in development), and Gigapixel's innovative approach to designing graphics chips. RT 1291. Mr. Peddie described the Gigapixel merger as a "desperate move" which was difficult to link with a rational business purpose. Ex. BZ, ¶ 5.

### 4. Relationship between nVidia and 3dfx

Historically, nVidia and 3dfx had developed a well-known rivalry with each other in the small field they occupied. As Mr. Leupp, described it, "[b]efore 3dfx bought STB Systems, 3dfx and nVidia had been serious competitors with one another. The two companies were rivals down to the bone, and I understood that the cul-

---

4. *See* Ex. BZ, ¶¶ 3–9 for details regarding Mr. Peddie's credentials. Mr. Peddie is the principal of a technically oriented marketing and management consulting firm that issues market reports and publishes a bi-weekly report on computer graphics and emerging trends in digital media technology.

ture among our engineers was hostile to nVidia." Ex. BV, ¶ 27.

By the fall of 2000, nVidia did not view 3dfx as a direct competitor because following the STB merger, 3dfx sold only its own boards incorporating its own graphics chips. Ex. BT, ¶ 11. Jen–Hsun Huang, nVidia's chief executive officer, testified that nVidia's market focus was on selling its chips to original equipment manufacturers, whereas 3dfx's focus was primarily on selling its chips as part of add-in boards sold directly in the retail channel. At the time, the end-users of nVidia's chips were purchasers of computers that already contained an nVidia graphics chip. Thus, the end-users of 3dfx's chips were people who purchased an entire graphics board containing 3dfx chips from retailers and then added those boards to their computers. Ex. BT, ¶ 5; Ex. 5011, p. 15.

3dfx and nVidia were also suing each other for patent infringement (collectively, the "Patent Litigation"). In September 2000, the District Court hearing the Patent Litigation issued a ruling favorable to 3dfx, largely adopting the 3dfx position and largely rejecting nVidia's. Ex. 53; RT 187.

### 5. 3dfx's Financial Problems

In the beginning of 2000, 3dfx had approximately 650 employees. Approximately 265 of these employees were engineers. 3dfx's Mexican subsidiary also had roughly 1200 employees working in its Juarez, Mexico board manufacturing facility. 3dfx had business premises in San Jose, California and Richardson, Texas. Its graph-

ics chips were manufactured in Taiwan. Ex. 5011, p. 16.

Mr. Peddie testified that although 3dfx was not a small company, its competitors, including nVidia, were larger and more sophisticated and also had stronger financial backing. Because of 3dfx's limitations, it fell behind the technology cycle, produced inferior products, and its operation as a merchant chip company was doomed. By the fall of 2000, 3dfx had effectively designed itself into a corner by committing to an outmoded chip architecture that was not scalable or economical. The company did not recognize the importance of single chip compatibility, and ignored the importance of industry compatibility. Ex. BZ, ¶¶ 12–13.

3dfx's SEC filings confirm this general assessment as did Mr. Leupp. Ex. BV, ¶¶ 8–9; Ex. 5011, p. 35; Ex. 5054, pp. 19–23.

By the time of the Transaction on December 15, 2000, 3dfx had sustained losses each quarter since the quarter ending April 30, 1999.[5] By the end of the third quarter of 2000, 3dfx was also experiencing high inventory expenses, declining margins and slowing demand for its products. Ex. BV, ¶ 8; Ex. BU, ¶ 8.

In its 10–Q filed on December 20, 2000, 3dfx reported a net loss of $291.5 million for the nine months ending October 31, 2000, and reported that during the three months ending October 31, 2000, it had recorded a charge of $117 million for the impairment of goodwill and other intangibles. Ex. 5054, pp. 3, 9–10.

---

**5.** 3dfx had reported a net loss of $2.1 million for the quarter ending April 30, 1999; a net loss of $11.6 million for the quarter ending July 31, 1999; a net loss of $17.6 million for the quarter ending October 31, 1999; a net loss of $31.9 million for the quarter ending January 31, 2000. Ex. 5011, p. 27. 3dfx reported a net loss of $12 million for the quarter ending April 30, 2000, a net loss of $100 million for the quarter ending July 31, 2000. Ex. 5015, p. 2. 3dfx reported a net loss of $178 million for the 3 months ending October 31, 2000. Ex. 5054, p. 2. 3dfx reported a net loss of $63 million for fiscal year 2000. Ex. 5065, p. 3.

By the fall of 2000, not only had 3dfx suffered six consecutive quarterly losses, but it also had essentially run out of cash, and had even invited bankruptcy counsel to address the November 20, 2000 board meeting. Ex. 5027. According to Mr. Leupp, whether or not 3dfx signed a deal with nVidia on December 15, 2000, 3dfx would have found it necessary to lay off most, if not all, of its employees. Ex. BV, ¶ 36.

## C. Events Preceding the Transaction

### 1. 3dfx Retains Robertson Stephens

In September 2000, 3dfx decided to try to sell its board business assets and retained Houlihan Lokey Howard & Zukin to advise it in that effort. In October 2000, 3dfx also retained the investment banking firm of Robertson Stephens to conduct a search to identify parties interested in either a strategic or financial transaction with 3dfx. Robertson Stephens was well recognized at the time as one of the premier investment banking firms for technology companies such as 3dfx.[6] 3dfx management and Robertson Stephens gave information to numerous parties, several of whom signed confidentiality agreements and received detailed information regarding 3dfx. Ex. 5057, pp. 42–43.

3dfx also explored several restructuring alternatives, including selling the board business assets and returning to its previous model of designing and selling graphics chips, selling the board manufacturing assets in Mexico, and selling the stock of

STB. 3dfx approached several companies, including Intel, ATI, and AMD, regarding potential transactions. None of these companies were interested. Ex. BV, ¶¶ 11–18.

### 2. nVidia Retains Morgan Stanley

Following contact initiated by 3dfx in September 2000, nVidia indicated its interest in exploratory discussions. Ex. BT, ¶ 9. Around this same time, nVidia retained Morgan Stanley to assist it in the evaluation of a potential transaction with 3dfx. Ex. CE, ¶¶ 13–17. On or about November 20, 2000, nVidia and 3dfx entered into a letter agreement relating to the treatment of confidential information (the "Non–Disclosure Agreement"). Ex. 5026.

In late November 2000, Morgan Stanley provided the nVidia board of directors with its analysis of a potential transaction between 3dfx and nVidia (the "Project Titan Materials"). Ex. 5028.[7] Mark Waissar, who led the Morgan Stanley team working on the assignment, described this presentation to the nVidia board as reflecting a preliminary analysis period during which Morgan Stanley evaluated 3dfx's entire business because Robertson Stephens had requested that nVidia evaluate a purchase of the entire company, and Robertson Stephens did not believe that a partial purchase of assets would be feasible. Accordingly, the presentation primarily contemplated a merger structure between nVidia and 3dfx. Ex. CB, ¶¶ 12–13.

In the Project Titan Materials, Morgan Stanley expressed its preliminary view

---

**6.** Mr. Peddie described Robertson Stephens at the time as "widely recognized as one of the premier—and perhaps the premier—investment bank/financial advisor for West Coast technology firms such as 3dfx." Ex. BZ, ¶ 18.

**7.** Ex. 5028 was filed under seal pursuant to a protective order and remains sealed; it was

admitted for the limited purpose of disclosing Morgan Stanley's advice. Testimony regarding Ex. 5028 and Morgan Stanley's role in the Transaction are not sealed. Duplicate versions of Ex. 5028 designated as Ex. AB and Ex. 66, also remain sealed. *See* Docket no. 490.

that 3dfx's liabilities exceeded its assets and that 3dfx had little or no enterprise value. However, the presentation also stated that other off-balance sheet assets including 3dfx's engineering workforce had positive theoretical equity value which nVidia might derive in a merger. Ex. CB, ¶¶ 14–15.

One part of the Project Titan Materials suggested a hypothetical net equity value for 3dfx between $50 million to $125 million. This net equity value, in a merger context, was premised on (i) assigning a value of $1 million to $1.5 million per engineer for 75–100 engineers; (ii) the present value of a net operating loss tax shield of $12 million; (iii) a negative net asset value of $27 million; and (iv) closing and transaction costs of $10 million. In a section entitled "Transaction Headcount Multiples," Morgan Stanley provided a summary of seven change of control transactions involving technology companies for which a "per engineer" value for the acquisition or merger was derived based on the reported transaction price. The explanation for this data stated "[a]ssuming that 50% of the aggregate value is based on technology value, an appropriate aggregate value/engineer multiple would be in the range of $1.00MM-$1.5MM." Ex. 5028, p. 13.

Mr. Waissar testified that because of 3dfx's financial condition, Morgan Stanley could not implement a discounted cash flow valuation of the business, a net income analysis, an operating income analysis, a gross margin analysis or a revenue analysis. Instead, Morgan Stanley relied primarily on the "theoretical valuation of intangibles." Mr. Waissar testified that

this approach is removed from a profit and loss analysis, which will typically yield more reliable data. This preliminary valuation analysis was intended to give nVidia certain parameters which it could use to consider what a merger with 3dfx might be worth to nVidia. Ex. CB, ¶¶ 15–17.

### 3. Competing Offers: Via Technologies, Inc. and nVidia

As a result of the combined efforts of Robertson Stephens and 3dfx management, two offers emerged: one from Via Technologies, Inc. ("Via") and one from nVidia.[8]

The December 7, 2000 Via term sheet describes an investment of a total of $40 million in secured convertible notes, with $15 million to be funded upon signing definitive documents and an additional $25 million to be funded on completion of certain engineering milestones. The $15 million was to be secured by essentially all assets of 3dfx. Under the Via proposal, 3dfx was required to terminate the add-in board business, dismiss a large number of employees and deliver a new chip design by a specified deadline. Ex. G; Ex. BV, ¶ 19.

The December 7, 2000 nVidia term sheet describes an offer to purchase selected graphics chip assets for $100 million cash, subject to the limitation that a minimum of fifty-six of 3dfx's selected employees would accept employment offers from nVidia. If fewer than fifty-six accepted offers, there would be a $1 million per employee reduction in the purchase price. 3dfx was to continue to exist following the closing and, pending the closing, the parties would en-

---

8. Robertson Stephens had apparently advised interested parties that bids had to be submitted by December 4, 2000 and agreement had to be reached by December 15, 2000. Mr. Waissar testified that he understood there were two reasons for this: 3dfx was in deteri-

orating financial condition and 3dfx had postponed announcing its quarterly financial results until December 15, 2000. Ex. CB, ¶ 11; Ex. 5060, p. 43; Ex. CE, ¶ 31. nVidia's first term sheet was submitted in accordance with a December 4, 2000 deadline. Ex. 5033.

ter into an employee services agreement pursuant to which nVidia would pay the salaries of certain 3dfx engineers while they worked on nVidia projects (the "Employee Services Agreement"). The term sheet also provided that the definitive agreement would contain a provision requiring 3dfx to apply the cash proceeds in a manner acceptable to nVidia. To implement this, a portion of the purchase price would be held in escrow following the closing. Ex. BD; Ex. CE, ¶ 20.

On December 9, 2000, the 3dfx board met to consider the competing offers from Via and nVidia. The 3dfx board minutes set the stage as follows:

> Given the fact that the company had no imminent production, over 700 creditors, a significant monthly cash burn rate and approximately $60 million in debt ... the board of directors recognized that the company's precarious financial condition made it increasingly unlikely in the near term that it would be able to pay its debts as they become due and payable.

Ex. 5039.

The board first selected the Via proposal. However, one of the 3dfx board members informed nVidia that nVidia had time to submit a revised offer.[9] Ex. BV, ¶ 8; Ex. BT, ¶¶ 18–19.

On December 10, nVidia submitted a revised proposal which the 3dfx board voted to accept. Described in a term sheet dated December 11, 2000, this offer provided, *inter alia*, that (i) nVidia would purchase certain graphics related assets for $60 million cash and one million shares of nVidia common stock deliverable when 3dfx satisfied its liabilities and obligations; (ii) 3dfx could monetize a portion of the

stock consideration if it certified that the monetization would enable 3dfx to satisfy all of its liabilities and obligations; (iii) 3dfx would continue as a stand-alone entity; (iv) nVidia would provide a $15 million bridge loan to be funded upon signing; (v) nVidia would set up a $15 million fund earmarked to pay bonuses for engineers who accepted nVidia's employment offers; (vi) following execution of definitive documents, nVidia would deliver to 3dfx two lists of selected 3dfx employees to whom nVidia intended to offer employment; and (vii) the parties would enter into an Employee Services Agreement so that prior to the closing, 3dfx employees would work on nVidia projects at nVidia's expense. Ex. 5041; Ex. BT, ¶ 20; Ex. CE, ¶ 24.

### D. The Asset Purchase Agreement

#### 1. Documentation for the Transaction

Following the 3dfx board decision to accept the nVidia offer, certain terms of the proposed asset purchase continued to evolve. The final documentation for the Transaction included, *inter alia*, the APA, Voting Agreement, Credit Agreement, Security Agreement, Patent License Agreement, Patent Standstill Agreement, Trademark Assignment Agreement, and a fairness opinion for 3dfx. Exs. 5047–5049.[10]

It is not entirely clear when certain provisions that are in the APA were added or when certain provisions in the December 11, 2000 term sheet were deleted from the Transaction. For example, nVidia's counsel Paul Carmichael testified that early in the negotiations, nVidia proposed that the parties dismiss the Patent Litigation upon signing the APA. 3dfx proposed that the

---

9. Via was advised of this turn of events but dropped out of the bidding at this point. Ex. BV, ¶ 31.

10. Defined terms used in the APA will be used consistently herein.

Patent Litigation be dismissed upon closing of the Transaction and this is what the APA provides. Ex. CA, ¶ 27; Ex. 5047, p. 7. It is also unclear when 3dfx made the decision to dissolve pursuant to its Plan of Dissolution (as described in the APA). Ex. CA, ¶ 19; Ex. 5047, p. 1; Ex. 5060, p. 56. The Employee Services Agreement, described in early term sheets, was apparently deleted shortly before signing the APA on December 15, 2000, as was the $15 million bonus fund earmarked for the payment of bonuses to engineers. The cash was also increased from $60 million to $70 million. Ex. 5035; Ex. BD; Ex. 5041; Ex. CE, ¶ 27; RT 651–653, 734.

Certain provisions of the APA are relevant for a determination of the issues under consideration at this phase of the case.

Section 1.1 describes the Specified Assets to be sold as

> all of the properties, rights, interests, and other tangible and intangible assets (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP) ... that are or were used in ... or that otherwise directly or indirectly related to, the graphics business of the Seller Corporations (the 'Graphics Business').

Ex. 5047, p. 1.

3dfx is defined as the Seller and 3dfx and its subsidiaries are defined as the Seller Corporations. Ex. 5047, pp. 1, A–6.

The Specified Assets are defined in § 1.1(a)-(i). The Specified Assets include, *inter alia,* (a) Patents, Patent Applications, Trademarks, Tradenames; (b) Other Proprietary Assets, (defined as all Proprietary Assets and goodwill of the Seller Corporations, copyrights, trade secrets, know-how, computer software, inventions, designs, drawings, existing and in-development chip designs and related specifications, source codes, verification and validation environments, manufacturing specifications and databases, in-process research and development, product reviews); (c) Inventory, Equipment, and Other Tangible Assets; (d) Contracts; (e) Governmental Authorizations; (f) Claims; (g) Other Assets (defined as including existing and in development chip designs, related specifications, source codes, customer lists); (h) Books and Records; and (i) Proceeds. Ex. 5047, pp. 1–3. (The Court will refer to the assets defined in §§ 1.1(a), (b), (g), (h) as the Intellectual Property Assets.)

The APA also defines the Excluded Assets as those assets on Exhibit C (subject to the Closing Agreement) that directly and exclusively relate to the graphics board business of the Seller. Ex. 5047, p. A–3. The Excluded Assets on Exhibit C include the stock of the Seller Corporations, cash, and accounts receivable. Ex. 5047, p. nv45374.

Sections 1.2 and 1.3 of the APA describe the payment terms. In summary, nVidia agreed to pay $70 million cash at Closing (the "Cash Consideration"), and subject to the conditions in § 1.3, to deliver one million shares of nVidia common stock (the "Stock Consideration"). The essential restriction on the Stock Consideration was that the Stock Consideration was only deliverable upon completion of the winding up of the business of 3dfx pursuant to its Plan of Dissolution and upon certification that all Liabilities of the Seller Corporations had been paid in full or otherwise provided for in a manner satisfactory to nVidia. Upon certain conditions, 3dfx was permitted to obtain an advance on the Stock Consideration by monetizing up to a maximum of $25 million if this monetization was necessary and sufficient to enable 3dfx to pay its Liabilities in full. Ex. 5047, pp. 3–4.

Section 1.5 of the APA describes the $15 million credit facility and the non-exclusive, perpetual fully-paid license for all of the Patents (other than those involved in the Patent Litigation) and the sale of the Trademarks and Trademark Applications given in exchange for this bridge financing. Section 1.6 provides for the stay of the Patent Litigation pending closing. Ex. 5047, pp. 5–6.

Section 2.5 of the APA provides that the Specified Assets collectively constitute all of the properties, rights, interests and other tangible and intangible assets necessary to enable the Seller to conduct the Graphics Business in the manner in which the Graphics Business is currently being conducted and in the manner in which the Graphics Business is proposed to be conducted. Ex. 5047, p. 11.

Section 2.16 of the APA provides that the Disclosure Schedule accurately sets forth information regarding the employees of the Seller Corporations who perform services related to the Specified Assets or the Graphics Business. Ex. 5047, pp. 18–19. Schedule 2.16, dated December 15, 2000, lists approximately 300 names with salary information, but a later version of Schedule 2.16 states that after December 15, 2000, substantially all of Seller's employees were terminated. Ex. 5047, pp. nv45411–45418, nv45619–45626.

Section 4 of the APA describes the pre-closing covenants of 3dfx. Section 4.2(a) provides, in pertinent part, that 3dfx will: (i) preserve intact the current business organization relating to the Specified Assets and the Graphics Business; (ii) keep available the services of current employees relating to the Specified Assets and the Graphics Business; and (iii) maintain good relations and goodwill with all suppliers, customers, landlords, creditors, employees. Ex. 5047, pp. 26–28.

## 2. nVidia's Perspective Regarding the Transaction

Mr. Huang, nVidia's chief executive officer, testified that when nVidia first started discussing a possible transaction with 3dfx, nVidia believed that 3dfx would remain in the add-in board business and structured its first proposal on terms that would have made nVidia the exclusive supplier of chips to 3dfx. Because such a structure meant that 3dfx would no longer need engineers to design graphics chips, nVidia hoped to be able to hire a number of the best of them. However, because engineers were in short supply, nVidia also believed that the engineers would be in high demand by other companies and nVidia wanted to be able to recruit them before other companies did. Ex. BT, ¶ 12. In late November and early December 2000, nVidia had asked for and obtained two lists of the 3dfx engineers containing information about their compensation and Phil Carmack's[11] subjective assessment of their skills. Exs. 142, 162; Ex. BU, ¶¶ 16–17.

According to Mr. Huang, hiring the 3dfx engineers was the true value of the Transaction. He testified that the purchase price that nVidia agreed to pay had nothing to do with any attempt to value the assets that 3dfx was selling to nVidia. nVidia did not conduct a formal appraisal of the assets before signing the APA because the value of the assets was not what drove nVidia's interest in doing the deal or the purchase price. According to Mr. Huang:

11. Phil Carmack, vice president of hardware engineering at 3dfx until 1998, at Gigapixel in 1999, and again at 3dfx as executive vice president of research and development following the Gigapixel merger. He became an nVidia employee following the Transaction. Ex. BU, ¶¶ 7, 21–25.

The total consideration was competitively driven, i.e., what 3dfx management was willing to accept, what we felt we could afford, and what it took to beat out Via. It was very competitive because 3dfx had business relationships with Via; in the past there had been talks of partnership arrangements. What was important to nVidia in this transaction was not the value of the assets that we were buying, but the opportunity to be first in line to recruit the 3dfx design engineers. We were willing to pay a premium over the value of 3dfx's assets to get that head start over other potential suitors for the 3dfx engineers.

Ex. BT, ¶¶ 24–25.

Mr. Huang also testified that when it was apparent that 3dfx planned to dissolve after the Transaction, nVidia wanted to be sure that any dissolution was completed in a way that did no harm to nVidia, or to nVidia's reputation for fair dealing in the market, and did no harm to the creditors that nVidia and 3dfx had in common. Ex. BT, ¶ 37,

nVidia originally proposed to escrow the Stock Consideration until 3dfx could certify that its creditors had been paid in full. However, 3dfx wanted to be able to use the Stock Consideration to pay its creditors. Because nVidia wanted to use the Stock Consideration to motivate 3dfx to complete the transaction quickly, nVidia agreed to let 3dfx monetize an agreed maximum amount of $25 million to pay creditors if 3dfx could certify that doing so would result in full payment of its Liabilities. Ex. BT, ¶ 27.

### E. Events Following December 15, 2000

#### 1. 3dfx Announces the Transaction and the Termination of Employees

On Friday, December 15, 2000, the parties signed the APA and 3dfx management announced to its employees that the company was shutting down and the employees would be terminated. Ex. BV, ¶ 39. Phil Carmack testified that on December 15, 2000, he received written notification that he was being laid off. He understood that his colleagues also received this layoff notice. On December 18, 2000, he attended a presentation made by nVidia to certain of the engineers at which nVidia presented employment offers. Ex. BU, ¶¶ 20–24.

Mr. Huang testified that he and other members of nVidia's management met with 3dfx employees in Northern California on December 18, 2000 and then flew to Texas to meet with employees there. Ex. BT, ¶ 33. nVidia representatives met individually with the 3dfx employees nVidia wanted to recruit and made offers to approximately 120 of them. These offers included 10 percent pay increases, stock options and incentives to accept promptly. Ex. BT, ¶ 33; Ex. CE, ¶¶ 35–37.

Mr. Huang was confident that he would be able to persuade 3dfx engineers to accept nVidia's offers. RT 131, RT 167–168. Consistent with Mr. Leupp's view of historical animosity between the two groups of engineers, Christine Hoberg, nVidia's chief financial officer at the time, testified that other members of nVidia management did not share Mr. Huang's confidence and were very nervous about the recruiting process. She testified that some of the engineers viewed Mr. Huang as Darth Vader. RT 768.

nVidia ultimately hired 107 former 3dfx employees, most of whom were engineers. They began working at nVidia in early January 2001. Ex. BU, ¶¶ 19–25; Ex. BT, ¶¶ 33–34.

#### 2. nVidia Obtains Regulatory Approval

In order to obtain the required regulato-

ry approval of the Transaction,[12] nVidia filed a Notification and Report Form for Certain Mergers and Acquisitions with the Department of Justice and the Federal Trade Commission as required by the Hart–Scott–Rodino Antitrust Improvement Act of 1976 (the "HSR Notification"). Ex. 84.

Pursuant to § 801.10 of the Code of Federal Regulations, the value of the assets listed on the HSR Notification is to be either the fair market value or the acquisition price, if the acquisition price has been determined and if it is greater than the fair market value. 16 C.F.R. § 801.10 (2002). The HSR Notification states that nVidia is acquiring certain assets of 3dfx relating to its graphics business with an approximate value of $108 million. The $108 million was based on the $70 million in Cash Consideration and the value of the Stock Consideration as of December 15, 2000. Ex. 5064, p. 8. After approximately 30 days, nVidia obtained regulatory approval of the Transaction. Ex. 213.

### 3. Deloitte & Touche LLP and KPMG LLP: nVidia's Accounting for the Transaction

In December 2000, nVidia retained Deloitte & Touche LLP ("D & T") to assist it with its allocation of the purchase price to the assets acquired on a fair value basis for financial reporting purposes. D & T produced a report dated May 3, 2001 (the "D & T Report"). Ex. 5064. Based upon the sum of the Cash Consideration and the Stock Consideration it anticipated would be paid, nVidia management told D & T that the fair value of the assets to be acquired from 3dfx was approximately $107.4 million. Ex. 5064, p. 8. The phrase "fair value" used in the D & T Report was

the standard accounting definition for the purchase price paid by a willing buyer to a willing seller. Ex. CD, ¶ 7; Ex. U, pp. 71, 188–189.

nVidia management advised D & T that the net book value of the Inventory, Equipment and Other Tangible Assets was $2.4 million. D & T believed this was reasonably representative of the fair value of these assets and used this figure in its purchase price allocation. Ex. 5064, p. 25.

D & T attempted to allocate the remaining consideration ($105 million) to intangible assets consisting of: (i) an assembled workforce; (ii) Patents; (iii) Trademarks and Trade Names; (iv) other intangibles in the nature of goodwill; (v) developed technology; and (vi) in-process research and development. D & T concluded that the material contributory intangible assets were an assembled workforce, and Trademarks and Trade Names. Ex. 5064, p. 28.

Based on discussions with nVidia management concerning the composition of the assembled workforce, D & T determined that its value would likely be material enough to warrant its valuation for allocation purposes. D & T allocated $3 million to an assembled workforce of 107 employees based on the avoided cost of recruiting this many high-caliber employees. Ex. 5064, p. 28. Mark Maxson, the D & T principal in charge of the engagement, testified that there was economic benefit in this opportunity to recruit the 3dfx engineers and the D & T Report referred to this opportunity to recruit as an assembled workforce. Ex. CD, ¶ 11; Ex. 5064, pp. 20, 28.

D & T also believed that the 3dfx Trademark and Tradename portfolio was sufficiently established and recognized by retail

---

**12.** Section 7A of the Clayton Act, 15 U.S.C. § 18a (1996), and the rules promulgated thereunder.

consumers to justify attaching a value to it. D & T used the income approach and assigned a fair value of $11.310 million to the Trademark portfolio. Ex. 5064, pp. 31–32.

D & T attempted to allocate purchase price to the Patents and Patent Applications. nVidia management did not expect the Patents to generate any material third party license revenue and D & T stated that it could not attribute specific cash flows to the Patents due to the primarily defensive nature of the portfolio. D & T thus concluded that it could not estimate the value of the Patents with reasonable reliability. Ex. 5064, p. 31.

D & T also analyzed developed technology assets (described as proprietary assets, including trade secrets, source codes, and designs for existing chips) and in-process research and development (described as development assets not currently technologically feasible). D & T could not attribute individual cash flows to these assets, however, because nVidia had indicated it had no strategy to sell, lease, market or make alternative use of them. Accordingly, D & T concluded that the value of these assets was "inseparable from goodwill." Ex. 5064, p. 33.

Based on the $3 million allocated to avoided recruiting costs for the workforce, and the $11,310,000 allocated to Trademarks and Tradenames, D & T determined that the total fair value of the "identifiable intangible assets" was $14,310,000 and the fair value allocated to the tangible assets was $2,432,500. The remainder of the $107,437,500 assumed purchase price—

$90,695 million—was allocated to "goodwill." The D & T Report defined goodwill as the "residual amount remaining unallocated to an identifiable intangible asset." Ex. 5064, p. 3.

Mr. Maxson testified that D & T had no role in establishing the amount agreed to be paid by nVidia—D & T's only role was to assist in the accounting exercise that ended with the $90 million residual amount the D & T Report described as goodwill. Mr. Maxson stated:

> [T]he accounting concept [of] goodwill is usually an overpayment or synergies that are unique to the buyer, which is what causes [it]—excess purchase price is another term that's used sometimes . . . and that means consideration or deal value above and beyond the items that were actually received.

RT 1371. Mr. Maxson also testified that the $90 million in the goodwill category was a "residual number" and was not an opinion of the value of goodwill. RT 1371; Ex. CD, ¶ 16.

At some point in the due diligence process, nVidia retained the accounting firm KPMG LLP ("KPMG") to assist it in performing due diligence in connection with the Transaction. KPMG advised nVidia that applicable GAAP and SEC Rules [13] required nVidia to account for the Transaction as the acquisition of a business. This meant that nVidia had to include pro forma financial statements in the Form S–4 Registration Statement which was to be filed in January 2001. Exs. 5057, 5060.

Michael Dance, the KPMG audit partner, testified that if acquired assets had

---

**13.** *See* Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business, Issue No. 98–3 (2000) (Emerging Issues Task Force) ("EITF No. 98–3") and Pro Forma Financial Statement Preparation Requirements, SEC Reg. S–X, Rule 11–01, 17 C.F.R. § 210.11–02(a) (2008). The

EITF was formed by the SEC and the FASB in order to consider and respond to new issues in accounting practice. An EITF consensus is made part of GAAP until a later FASB pronouncement supersedes it. Ex. BX, ¶¶ 14, 16–17; Ex. P.

the ability to generate revenues, the pro forma information illuminated a transaction's continuing impact on the buyer's financial statements. In his view, D & T's allocation of purchase price to goodwill and Trademarks implied an ability to generate revenues and the allocation of purchase price to a workforce implied an ability to conduct business activities. Ex. 274(d), pp. 35:9–15; 42:21–25; 43:1–6; 54:1–10; 57:16–24; 58:1–11; 68:15–17; 71:23–72:1–12; Ex. T.

### 4. The Closing

On March 27, 2001, 3dfx held its annual shareholders' meeting at which 3dfx obtained shareholder approval of the APA and the Plan of Dissolution. Ex. 5060; Ex. BV, ¶¶ 40–42.

nVidia believed it had no obligation to close the Transaction because certain of the 3dfx representations and warranties in the APA were inaccurate. Ex. BT, ¶¶ 35–37. Nonetheless, the parties entered into a Closing Agreement pursuant to which nVidia paid the remaining $55 million in Cash Consideration and the Transaction closed on April 19, 2001. Ex. 5049, p. nv45010–45019; Ex. CE, ¶¶ 43–45. The parties also dismissed the Patent Litigation as the APA contemplated. Ex. 5049, p. nv45082–45087. The Stock Consideration was not provided to 3dfx due to the fact that it did not satisfy the conditions stated in § 1.3 of the APA. Ex. 5047, pp. 3–4.

Mr. Huang testified that by April of 2001, nVidia had substantially realized the benefits it had hoped to achieve from the Transaction. nVidia had succeeded in hiring about 100 engineers, and in exchange for funding the $15 million bridge loan, had received an assignment of 3dfx's Trademarks and Tradenames, and an irrevocable license to all of 3dfx's Patents (oth-

er than those at issue in the Patent Litigation). Ex. BT, ¶¶ 35–37.

Mr. Huang stated that nVidia paid the balance of the Cash Consideration because it was important that nVidia be viewed in the marketplace as a fair company and nVidia wanted to do what it could to assure that 3dfx paid its creditors, several of whom were nVidia's key suppliers. Ex. BT, ¶¶ 35–37.

## II. JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (E), (H) and (O).

## III. DISCUSSION

### A. Introduction

The Trustee contends that the APA transferred to nVidia 3dfx's *graphics business* or *business unit*, its *organized workforce*, and the economic goodwill *embedded in, attached to* or *associated with* that workforce. The Trustee's valuation expert contends these assets had a fair market value of at least $140 million. Accordingly, the Trustee claims the $70 million nVidia paid was not reasonably equivalent value for what it acquired.

nVidia argues that nVidia purchased only certain tangible and intangible assets and settled the Patent Litigation. According to nVidia's experts, these tangible and intangible assets and the settlement of the Patent Litigation had a fair market value of $13.4 million. nVidia paid $70 million for its own strategic reasons and because nVidia believed it was in a competitive bidding situation and needed to pay this amount to achieve its goals. nVidia asserts that it did not purchase a graphics business because, among other reasons, 3dfx did not have one at the time of the Transaction. nVidia also contends that it did not acquire an

organized workforce through the Transaction because outside the APA, nVidia individually recruited only certain of 3dfx's former engineers whose employment was terminated by 3dfx. nVidia also argues that engineers are not assets under fraudulent conveyance analysis.

The Trustee's theory of this case appears to be premised in part on a belief that the basic deal structure agreed to by the principals of 3dfx and nVidia was fundamentally unfair. This belief turns on the fact that the Stock Consideration was only deliverable when 3dfx certified that its creditors had been paid and the fact that only $25 million of the Stock Consideration could be monetized to pay creditors. The Trustee argues that this structure favored shareholders at the expense of creditors and that nVidia knew the $70 million in Cash Consideration and the additional $25 million available from the Stock Consideration was insufficient for 3dfx to satisfy its Liabilities.[14]

The Court notes that the Trustee sued certain former officers and directors of 3dfx for breach of fiduciary duty. The Court approved the Trustee's compromise of those claims pursuant to which the Trustee received $5.5 million in exchange for complete releases. (*See* Ch. 11 case no. 02–55795–RLE, Docket nos. 480, 496.) The Court also notes that the Trustee did not establish that nVidia knew the available cash would be insufficient for its stated purpose at any relevant point in time.

## B. Applicable Law

### 1. Civil Code § 3439, *et seq.*

■ The Trustee's Complaint is based on California Civil Code § 3439, *et seq.* applicable herein through Bankruptcy Code § 544(b)(1).

Civil Code § 3439.05 provides in pertinent part that:

[A] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value: in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer[.]

Cal. Civ.Code § 3439.05 (West 2008)[15].

■ The UFTA contains a number of definitions relevant to the Court's decision. Civil Code § 3439.01(i) provides that only transfers of "assets" are subject to avoidance. Section 3439.01(a) defines "asset" as "property of the debtor" and "property" is defined in § 3439.01(h) as anything that may be "subject of ownership." *Id.* Also, the property must be subject to enforcement of a money judgment. *See* Cal. Civ. Code § 3439.01, (Legis. Committee Comment, Assembly 1986).

### 2. Reasonably Equivalent Value

■ In determining whether a transfer has been for an exchange of reasonably equivalent value, the court analyzes all the circumstances surrounding the transfer. 5 *Collier on Bankruptcy* ¶ 548.05[1][b] at

---

**14.** Mr. Huang testified that it was 3dfx management that wanted the Stock Consideration. RT 510–513, 515–522. It is not clear from the record how or when the parties came to agree on the provision for monetizing part of the Stock Consideration.

**15.** California fraudulent conveyance law and Bankruptcy Code § 548 are similar in form

and substance and both may be analyzed contemporaneously. Accordingly, the Court has relied on cases decided under the UFTA, its predecessor, the Uniform Fraudulent Conveyance Act, and § 548 of the Bankruptcy Code. *See Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 594 (9th Cir. 1991).

548–35 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2002); *see also Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir.1997) (applying Bankruptcy Code § 548—reasonable equivalence should depend on all the facts of each case). In *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commerical Financial Services, Inc.)*, 350 B.R. 559 (Bankr.N.D.Okla.2005), the court explained:

> Generally, the 'totality of the circumstances' test is fact-intensive and may include consideration of fair market value (which may be established by comparable sales, income production capacity or some other valid measure of value), the arms-length nature of the transaction, the economic circumstances and relationship of the parties, the maturity, competitiveness and efficiency of the market, industry standards, and other factors.

*Id.* at 577.

■ The phrase "reasonably equivalent value" is not defined in the UFTA or the Bankruptcy Code. As the court explained in *In re Kemmer*, 265 B.R. 224 (Bankr. E.D.Cal.2001), defining reasonably equivalent value has been left to the courts:

> [t]here is no hard and fast rule in the Ninth Circuit as to what constitutes 'reasonably equivalent value.' The concept of 'reasonable equivalence' is not wholly synonymous with 'market value' even though market value is an extremely important factor to be used in the court's analysis.

*Id.* at 232 (citation omitted).

■ Because the policy behind fraudulent conveyance law is to preserve assets of the estate, reasonably equivalent value is determined from the standpoint of the estate's creditors, it is not determined from the defendant's perspective. *See Frontier Bank v. Brown (In re Northern*

*Merchandise, Inc.)*, 371 F.3d 1056, 1059 (9th Cir.2004) (citing *Harman v. First Am. Bank (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 484 (4th Cir. 1992)) (primary focus is on the net effect of the transaction on the debtor's estate and the funds available to pay the unsecured creditors); *Gill v. Maddalena (In re Maddalena)*, 176 B.R. 551, 555 (Bankr.C.D.Cal. 1995) (debtor's creditors suffered a significant net loss in comparing the value of what was transferred by debtor to the value of what he received in exchange); *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 578 (Bankr.N.D.Cal. 1994) (reasonable equivalence analysis is from perspective of creditors of the estate); *In re Consol., Capital Equities Corp.*, 143 B.R. 80, 87 (Bankr.N.D.Tex. 1992) (citing *Kirkland v. Risso*, 98 Cal. App.3d 971, 159 Cal.Rptr. 798 (1979)) (applying California law, when analyzing the fairness of consideration the court assumes a creditor's perspective).

■ Finally, as the court noted in *Pajaro Dunes*, if it is necessary for a just result, the court may construe a segmented transaction as one transaction. *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. at 584. The court need not allow the labels put on a transaction by the interested parties to control the rights of third parties. *Id.* at 584–85 (citing Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law*, 38 Vand. L.Rev. 829 (1985)).

## 3. Burden of Proof

■ Under both the UFTA and Bankruptcy Code § 548, the Trustee has the burden of proving the elements of a fraudulent transfer by a preponderance of the evidence. *Whitehouse v. Six Corp.*, 40 Cal.

App.4th at 534, 48 Cal.Rptr.2d 600; 5 *Collier on Bankruptcy* 1548.10 at 548–80.5.

■ While the burden of proof itself does not shift, during the progress of the case, the burden of going forward with the evidence to rebut a prima facie case may shift. *See Braunstein v. Walsh (In re Rowanoak Corp.)*, 344 F.3d 126, 131 (1st Cir.2003) (burden of proof does not shift but duty of going forward may shift if trustee establishes prima facie case); *Whitehouse v. Six Corp.*, 40 Cal.App.4th at 534, 48 Cal.Rptr.2d 600 (applying UFTA, plaintiff has burden of proof but burden shifts to defendant upon threshold showing of less than reasonably equivalent value); 5 *Collier on Bankruptcy* ¶ 548.10 at 548–80.5–81.

■ To establish his prima facie case, the Trustee must prove what was transferred, that what was transferred is subject to avoidance under applicable law, and the fair market value of what was transferred or surrendered. By comparing the fair market value of the property transferred to what was received, the Trustee may establish that 3dfx did not receive a reasonably equivalent value in exchange. *See In re Maddalena*, 176 B.R. at 553–54.

The Trustee contends that the Summary Judgment Order establishes his prima facie case that the *assets* transferred to nVidia had a fair market value of at least $108 million.[16] The Trustee also contends that he proved at trial that the *assets* actually transferred to nVidia included a workforce, intellectual property and goodwill with a fair market value of $140 million. From this contention, the Trustee argues in his

Post–Trial Brief that the burden shifted to nVidia to show "that assets not subject to the fraudulent conveyance law were included in the assets acquired and the value of those assets." Docket no. 452, Trustee's Post–Trial Brief, p. 8.

■ The Summary Judgment Order does not establish the Trustee's prima facie case, nor does it shift the burden of production or burden of proof to nVidia. The Summary Judgment Order simply says that nVidia may not claim that the *transaction value* is something other than $108 million. To the extent this may be unclear, the Court may use its inherent authority to interpret its orders. *See In re Menk*, 241 B.R. 896, 906 (9th Cir. BAP 1999) (citing *Beneficial Trust Deeds v. Franklin (In re Franklin)*, 802 F.2d 324, 326–27 (9th Cir.1986)); *Koehler v. Grant*, 213 B.R. 567, 569 (8th Cir. BAP 1997) (bankruptcy court retains subject matter jurisdiction to interpret orders entered prior to dismissal); *see also In re United States Brass Corp.*, 255 B.R. 189, 192 (Bankr.E.D.Tex.2000), *aff'd* 301 F.3d 296 (5th Cir.2002) (bankruptcy court has jurisdiction to clarify and enforce its own orders). The Court's Summary Judgment Order does not set a floor of $108 million for valuation purposes and does not shift the burden of production or proof to nVidia.[17] It simply provides that nVidia may not claim that the *transaction value* is something other than $108 million and nVidia does not make such a claim.

### 4. Valuation Principles

■ In dealing with the conflicting views of the valuation experts, this Court

---

**16.** This argument is based on the fact that nVidia stated $108 million in the HSR Notification.

**17.** *See* Declaration of John Sipple filed in support of nVidia's Opposition to Trustee's

Motion for Summary Judgment explaining context for the HSR Notification and how it is used to assess potential impact on competition. Docket no. 139.

finds the analysis of the court in *Peltz v. Hatten,* 279 B.R. 710, 737–738 (D.Del. 2002), *aff'd sub nom., In re USN Comm., Inc.,* 60 Fed.Appx. 401 (3d Cir.2003) both wise and instructive:

> First, it is clear that experts and industry analysts often disagree on the appropriate valuation of corporate properties, even when employing the same analytical tools such as a [discounted cash flow] analysis or a comparable sales method. Simply put, when it comes to valuation issues, reasonable minds can and often do disagree. This is because the output of financial valuation models are driven by their inputs, many of which are subjective in nature.... Second, in determining whether a value is objectively "reasonable" the court gives significant deference to marketplace values. When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight.

*Id.* at 737 (citations omitted). This Court will view the evidence on fair market value and reasonably equivalent value through this philosophical lens.

The valuation experts, Roger Grabowski [18] for nVidia, and Michael Wagner [19] for the Trustee, had appropriate credentials for the task and agreed on many fundamental valuation principles. Mr. Wagner and Mr. Grabowski agreed that the over-arching objective of the valuation exercise was to predict the most probable price at which the assets would have been sold in the applicable competitive open market on the valuation date under conditions requisite to a fair sale. They both defined fair market value as the price expressed in terms of cash equivalents at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and both have reasonable knowledge of relevant facts. Ex. 43, ¶ 6; Ex. BW, ¶¶ 11; RT 918–924.

Mr. Grabowski and Mr. Wagner also agreed that Robertson Stephens had done a competent and thorough job of seeking out any and all investors or purchasers for 3dfx, in whole or in part, and would have been able to solicit the most likely prospective buyers or investors in the market as it existed at that time. In other words, they agreed that an appropriate market exposure had taken place. Ex. Q, pp. 4, 14–15; RT 925–929. *See also* Ex. AC, pp. 9–14.

### 5. The Use of Generally Accepted Accounting Principles

One of the cornerstones of the Trustee's theory of this case is that nVidia accounted for the Transaction as the purchase of a business under generally accepted accounting principles ("GAAP") so the Court must find that the Transaction was the purchase of a business for fraudulent conveyance purposes.[20]

---

**18.** *See* Appendix C to Ex. BW for complete details regarding his credentials. In brief, Mr. Grabowski is Managing Director, Standard and Poor's Corporate Value Consulting, Chicago.

**19.** *See* Ex. 2 to Ex. 43 for complete details regarding his credentials. In brief, Mr. Wag-

ner is Senior Advisor at Charles River Associates, Inc.

**20.** In 2002 nVidia told the SEC: "The purchase of certain assets of 3dfx constituted the purchase of a 'business' as defined by EITF 98–3 ... [the engineers] had the ability to continue business activities they conducted

Parties to avoidance actions who have taken the Trustee's approach that GAAP dictate a bankruptcy court's determination of solvency, have generally been unsuccessful. *See Arrow Electronics, Inc. v. Justus (In re Kaypro)*, 230 B.R. 400, 413 (9th Cir. BAP 1999) *aff'd in part rev'd in part*, 218 F.3d 1070 (9th Cir.2000) (GAAP relevant but not controlling in insolvency determinations); *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 278 (9th Cir. BAP 1989) (court is to make determination of solvency, not accountants and board which promulgates GAAP); *Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 151 B.R. 1012, 1019 (Bankr.N.D.Cal.1993), *aff'd*, 195 B.R. 455 (N.D.Cal.1996) (GAAP do not control solvency determination, solvency inquiry must be to what extent an asset would have value for a creditor attempting to satisfy its claim, goodwill can not be sold to satisfy creditor's claim).

In *EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348 (Bankr. D.Del.2008) both parties in a fraudulent conveyance action cited to IRS Revenue Procedure 77–12 to support their arguments about valuing the inventory of a retail business for solvency purposes (*i.e.*, was it appropriate to use book value or to make an upward adjustment because the inventory was to be sold at retail?). In dismissing the arguments that the Revenue Procedure provided an answer, the court found the "Revenue Procedure, like [GAAP,] to be unhelpful because the tax and accounting implications of how assets are listed on a company's balance sheet often have little to do with what a willing buyer and willing seller would agree is the fair market value of those assets." *Id.* at 357, n. 3.

The parties in *EBC I* also disagreed regarding the relevance of GAAP treatment of preferred stock. The court found that GAAP was irrelevant to the question before it.

> GAAP does not deal with the true market value of assets or the determination of what are legal liabilities of a company ... Just as GAAP rules regarding the book value of assets does (sic) not determine their fair market value, similarly GAAP rules for treating debt as equity and vice versa are not relevant in determining whether they are truly debt or equity.

*Id.* at 358 (internal citations omitted).

The opinion of Roman Weil,[21] nVidia's accounting expert, is consistent with this position. In explaining why nVidia used purchase accounting for the Transaction, he stated:

> GAAP provide that if the acquirer purchases enough assets so that it could readily, that is with minor effort and cost, purchase additional assets to have a stand-alone business, even if it has not, then the acquirer should use purchase accounting for the assets it did purchase. GAAP do not mean, by applying the purchase accounting rule, that the asset purchase must have resulted in the purchase of a business as that term is used in nontechnical language or that the transaction was an acquisition of all the assets and liabilities of the company. nVidia's accountants invoked purchase accounting in order to explain why it

---

before the acquisition ... nVidia obtained the critical elements of a business (*i.e.*, long lived assets, intellectual property, trademarks and an organized skilled workforce ..." Ex. 5086.

21. *See* Exhibit 1 to Ex. N for complete details regarding Mr. Weil's qualifications as an expert on accounting issues. In brief, he is a professor of accounting at the Graduate School of Business of the University of Chicago.

used fair values, instead of book values, and why it recorded goodwill for the transaction.

Ex. N, p. 9.

For purposes of the issues to be decided here, this Court believes that the positions taken in *Kaypro, Sierra Steel, Richmond Produce* and *EBC I* in the context of solvency determinations are applicable. GAAP or SEC rules will not be used to exclude facts or the required analysis of those facts, or to supplant the Court's fact finding role in this context. GAAP will not determine what constitutes an asset or the fair market value of an asset. The Court's determination of what constitutes an asset will be guided by the applicable UFTA definition, not the accounting definition.[22] The evidence presented on whether the Transaction accomplished the sale of a business or a workforce or goodwill and the evidence on fair market value will supply the answers to the remaining questions. *See also Thor Power Tool Co. v. Comm'r of Internal Revenue,* 439 U.S. 522, 542–44, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) (discussing fact that the characterization of a transaction for accounting purposes and for tax purposes need not necessarily be the same; the tax and accounting systems have different goals, the goal of the tax system is equitable collection of revenue, the goal of the financial accounting system is to give useful information to participants, to protect them from being misled); *In re WorldCom, Inc. Sec. Litig.,* 352 F.Supp.2d 472, 478–479 (S.D.N.Y. 2005) (discussing GAAP in general and the purpose of financial reporting as stat-ed in FASB Statement of Financial Accounting Concepts No. 1 and No. 2 in the context of a securities fraud case).

## C. Valuation Testimony

### 1. Introduction

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702 (West 2008)

The court acts as the gatekeeper in order to assure that expert testimony rests on a reliable foundation and is relevant to the task at hand. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The court's gatekeeper role involves an assessment of whether the reasoning or methodology underlying the testimony is valid and an assessment of whether that reasoning or methodology properly can be applied to the facts in issue. *U.S. v. Hermanek,* 289 F.3d 1076, 1093 (9th Cir.2002) (citation omitted); *see also Zenith Elec. Corp. v. WH–TV Broadcasting Corp.,* 395 F.3d 416, 419 (7th Cir. 2005) (expert must offer good reason to

---

**22.** Statement of Financial Accounting Concepts No. 6 defines assets as probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events. *Elements of Financial Statements,* Statement of Financial Accounting Concepts Number 6 at ¶ 25 (Financial Ac-counting Standards Board 2008). An asset has the capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash inflows. *Id.* at ¶ 26. This accounting definition of an asset is at odds with the UFTA definition of an asset.

think his approach produces an accurate estimate using professional methods and estimate must be testable, capable of being replicated).

■ Rule 702 "does not mean that the trier of fact must rely upon expert testimony which is unsatisfactory or that the trier of fact is precluded from making an independent determination of the facts, regardless of how complicated or 'specialized' the subject matter may be." *In re Opelika Mfg. Corp.*, 66 B.R. 444, 450 (Bankr.N.D.Ill.1986) (citation omitted). The court may decline to accept an expert's opinion, in whole or in part, and may reject an expert's opinion based upon its conclusions regarding the expert's credibility. *See In re Commercial Financial Services*, 350 B.R. 559 (Bankr.N.D.Okla.2005) (admitting expert testimony in fraudulent conveyance action due to its perceived reliability); *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y.2003), *aff'd* 99 Fed.Appx. 274 (2nd Cir.2004) (excluding expert testimony in fraudulent conveyance action due to its perceived unreliability).

■ Even uncontradicted expert testimony is not necessarily conclusive. *See Security–First Nat'l Bank of L.A. v. Lutz*, 322 F.2d 348, 355 (9th Cir.1963) (expert testimony is not conclusive upon the trier of fact even though uncontradicted but trier of fact may not act arbitrarily in disregarding uncontradicted, testimony of witnesses whose qualifications and judgment have not been discredited); *In re Villas at Hacienda Del Sol, Inc.*, 364 B.R. 702, 710 (Bankr.D.Ariz.2007) (court not required to accept testimony simply because it is the only testimony in the record, it still must be credible).

### 2. nVidia's Valuation Expert

Roger Grabowski, nVidia's valuation expert, offered his opinion that the Specified Assets identified in the APA and had a fair market value totaling $13,432,500. Mr. Grabowski valued the Intellectual Property Assets at $6 million ($5 million with a contingent value of an additional $1 million). He valued the Inventory, Equipment and Other Tangible Assets at $2,432,500. He valued the settlement of the Patent Litigation claims at $5 million. Ex. BW, ¶¶ 15–16; Ex. Q, pp. 6, 31–35. Mr. Grabowski attributed no value to a graphics business, goodwill or a workforce.

### a. Graphics Business, Goodwill, Workforce

Mr. Grabowski testified that, in his opinion, 3dfx did not have a graphics chip business to sell as of the December 15, 2000 valuation date and what 3dfx sold did not constitute a *business*. In addition, in his opinion, there was no basis to attribute any going concern value to the Specified Assets if they were erroneously recharacterized as a graphics chip business. Ex. BW, ¶¶ 18–19; Ex. Q, pp. 9, 12–13.

Mr. Grabowski also concluded that it was impossible to attribute substantial going concern value or enterprise value to 3dfx under standard methods for valuing an intact business, such as a discounted cash flow analysis. Ex. BW, ¶ 20. For example, 3dfx's historical operating income (based on EBIT) as disclosed in its quarterly SEC filings was consistently negative: ($30 million) as of January 31, 2000; ($13 million) as of April 30, 2000; ($30 million) as of July 31, 2000; ($65 million) as of October 31, 2000. Ex. Q, p. 14.

Mr. Grabowski also stated that the Transaction did not include a workforce, as part of, or separate from, a business. Ex. BW, ¶¶ 29–31; Ex. Q, pp. 5, 54–55. The Transaction did not (and could not) purport to sell the 3dfx workforce to nVidia because employees are not assets that can be sold or transferred, and the APA does

not list them as part of the property sold. 3dfx terminated the employees shortly after the APA was signed and the employees became "free agents." 3dfx did not cause nVidia to hire 3dfx's employees and the APA was not structured in a manner that required or encouraged this hiring. The employees nVidia hired also did not constitute a workforce. nVidia identified certain individuals, not a team of engineers, extended offers to these individuals, and upon hiring, dispersed them to work on different projects for nVidia. Ex. BW, ¶¶ 29–31; Ex. Q, pp. 5, 54–55.

### b. Inventory, Equipment, Other Tangible Assets

Mr. Grabowski testified that the Inventory, Equipment and Other Tangible Assets described in § 1.1(c) of the APA had a fair market value of $2,432,500. He relied on D & T's analysis which had, in turn, relied on the fact that nVidia management represented that the net book value of these assets was reasonably representative of their fair value. Ex. Q, pp. 30–31; Ex. 5064, p. 25.

### c. Patents

For the Patents (other than those involved in the Patent Litigation), Patent Applications and in-process research and development, Mr. Grabowski concluded that an income approach was inapplicable because nVidia did not incorporate these assets into its product lines and did not project an earnings stream from their commercial application. Mr. Grabowski also concluded that a market approach was inapplicable because he found no individual patent sales in the industry other than those arising from litigation settlements and thus could not identify an appropriate market value. Mr. Grabowski noted that nVidia's primary intellectual property attorney, Paul Carmichael, had estimated

that the value of the Patents was $5 million based on the fact that nVidia acquired the Patents for defensive purposes and for the marginal enhancement of its portfolio. Mr. Grabowski thus concluded that $5 million was a reasonable estimate for the value of the Patents. Ex. Q, pp. 25–27.

### d. Trademarks

Mr. Grabowski concluded that the Trademarks and Tradenames had immaterial value. Ex. Q, pp. 27–28. First, in his view, brand names and brand recognition do not sustain product loyalty in the relevant 3D graphics market. Instead, state-of-the-art designs, performance and timely product launch are more important. Second, 3dfx's Trademark value was diminished when 3dfx changed to add-in board sales in mid–1999 because in that market a developed brand name is not as important as product cost and performance. Third, nVidia did not use the Tradenames in any products and there was no apparent market interest in licensing the Tradenames to third parties. In addition, the fact that 3dfx had not generated a positive operating margin for approximately two years indicated that the branded products were not generating any excess profit for 3dfx. Ex. Q, pp. 27–28.

### e. Patent Litigation Claims

Mr. Grabowski valued the Patent Litigation claims as assets to be exposed to the market and sold. Mr. Grabowski's opinion was that the Patent Litigation claims had a fair market value of $5 million based on a hypothetical cash settlement of the litigation. Ex. Q, pp. 31–46. Mr. Grabowski proposed three possible scenarios: nVidia as a hypothetical buyer of the claims, a hypothetical strategic buyer of the claims, and a hypothetical financial buyer of the claims. He concluded that the first scenario presented the highest possible fair

market value of no greater than $5 million. Ex. Q, pp. 46–50.

#### f. Contingent Value

Mr. Grabowski also discussed a contingent value for the Intellectual Property Assets and the Patent Litigation claims in order to test the fairness of the purchase price in the APA. He defined contingent value as an identified and supportable market value of those assets if alternatively offered for resale to an industry competitor and strategic buyer other than nVidia or a financial buyer who may assert patent infringement damages against industry competitors. Ex. Q, pp. 3–4, 29, Appendix A.

In this analysis, Mr. Grabowski estimated the potential value of the Intellectual Property Assets and the Patent Litigation claims to a hypothetical buyer who would exploit these assets through continued marketing and sale of 3dfx products for a hypothetical two year period by projecting cash flows derived by projecting product sales based on 3dfx market share and projecting a sales forecast based on historical trends before the Transaction. This analysis showed a present value of cash flow attributable to the contingent value for the Intellectual Property Assets and the Patent Litigation claims of no more than $1 million. Ex. Q, pp. 29–30, Appendix A, Exs. I and II.

#### 3. The Trustee's Valuation Expert

Michael Wagner, the Trustee's expert, offered his opinion that in the Transaction nVidia acquired the 3dfx graphics business and the "portion of 3dfx" acquired had a fair market value of not less than $140 million. Ex. 43, ¶¶ 5, 48. Mr. Wagner used three valuation methods in which his conclusions ranged from $108 million to $155.7 million. Mr. Wagner's $140 million

conclusion is based on the high mean of these three approaches.

#### a. Graphics Business, Goodwill, Workforce

Mr. Wagner testified that a graphics business was transferred because nVidia used purchase accounting, because of certain language in the APA, and because nVidia hired 100 engineers. Ex. 43, ¶¶ 13–23. While Mr. Wagner believed the Transaction accomplished the transfer of a business (and its workforce), he did not employ any of the standard valuation methods one might expect for valuing a business. For example, Mr. Wagner did not use a discounted future earnings method or discounted cash flow analysis. RT 990–992, 995. He did not use an excess earnings method which would have allowed him to calculate a value for the economic goodwill. RT 992–993, 996. He did not do a net income analysis or net present value analysis. RT 996.

Mr. Wagner also testified that while he did not specifically identify going concern value in his total values, it was nonetheless there. RT 1000. Mr. Wagner did not value the Other Proprietary Assets (defined in the APA as including know-how and trade secrets), the employee information that had been provided during the due diligence period, the access provided to nVidia to make its recruiting pitches, or the cancellation of the Non–Disclosure Agreement. He did not provide a separate valuation for goodwill or a going concern but testified that there was economic support for it in the engineers themselves. RT 1000–1002.

Mr. Wagner assigned significant value to something he variously described as the *access* to 3dfx engineering talent, the *engineers* themselves, or an assembled workforce. Ex. 43, ¶ 5 (asset is access to 3dfx engineering talent); Ex. 43, ¶ 54 (asset is

3dfx engineers); Ex. 44, pp. 22–23 (fair valuation is $1.25 million per engineer); RT 1023 (engineers does not mean people); RT 1033 (asset is information described on Ex. 44, p. 17).

### b. Buyside Valuation

■ In his first method, a buyside[23] valuation, Mr. Wagner concludes that the value of the *business* ranged from $108 million to $114 million. This buyside analysis is based on his review of the Project Titan Materials, certain nVidia correspondence with 3dfx and the consideration payable under the APA. Mr. Wagner looked to the following: $99 million in nVidia's November 29, 2000 proposal letter to 3dfx; $100 million in a December 1, 2000 term sheet; $117 million in a November 29, 2000 nVidia internal board presentation; $115–$169 million in net equity value in the Project Titan Materials; $108 million in the HSR Notification; $107–$114 million in possible consideration in APA. Ex. 44, pp. 14–15, Schedule 2.1, pp. 4–5; Ex. 43, ¶ 49. Mr. Wagner states that he adjusted these numbers to reflect the final terms of the Transaction. Ex. 43, ¶ 49.

### c. Implied Market Capitalization

In his second method, an implied valuation based on 3dfx's market capitalization, Mr. Wagner states that at the time of the Transaction, the net value of the *business* of 3dfx was $162 million and the value of the *assets* acquired by nVidia was $151 million. Ex. 43, ¶¶ 50–53. In this analysis, Mr. Wagner starts from the premise that the 3dfx share price prior to the announcement of the Transaction could be used to assess market expectations of the value of the 3dfx business. The price dropped from approximately $1.94 per share on December 14, 2000 to less than 50 cents per share after the public announcement of the Transaction. According to Mr. Wagner:

> [t]his information reveals that the market expected a greater return on its investment than the transaction with nVidia provided. In other words, in the eyes of the market, nVidia underpaid. In contrast, the nVidia share price rose significantly between the time of the announcement and the closing of the transaction.

Ex. 44, pp. 15–17.

To arrive at $151 million, Mr. Wagner calculated that the *adjusted business enterprise value* of 3dfx was $73.8 million. This $73.8 million business enterprise value is based on 39.4 million outstanding shares at $1.94/share for an *equity value* of $76.4 million plus debt of $31 million for a *business enterprise* value of $107.4 million minus cash of $33.6 million. Mr. Wagner added $88.3 million in liabilities to the $73.8 million enterprise value to arrive at the $162.1 million net value of the business acquired by nVidia from which he subtracted $11.4 million for the post-transaction value of assets remaining with 3dfx. Using this approach, Mr. Wagner concluded that the value of the *assets* acquired by nVidia was $151 million. Ex. 44, Schedule 3, pp. 9–13.

### d. Sum of the Parts

In his third method, which he called the sum of the parts valuation, Mr. Wagner concluded that nVidia had acquired property worth $155.7 million. Mr. Wagner

---

**23.** The term "buyside valuation" is generally used to describe a buyer's internal analysis of a potential transaction—in the context of conducting its due diligence. The approach seems inapposite here where the task was to determine the fair market value of the assets involved in the deal from an entirely different perspective—as he himself articulated. RT 917, 919–924.

assigned a value of $2.4 million to the Inventory, Equipment and Other Tangible Assets; a value of $5 million to the Patents (other than those involved in the Patent Litigation); a value of $11.310 million to the Trademarks and a value of $12 million to the settlement of the Patent Litigation, for a total of $30.7 million. Mr. Wagner did not perform any original analysis of these assets; he simply adopted the analysis performed by D & T (for the Trademarks) and nVidia management (for the Inventory, Equipment, and Other Tangible Assets, the Patents, and the Patent Litigation claims). Ex. 43, ¶¶ 65–70. Mr. Wagner then valued an "assembled workforce" at $125 million based on valuing 100 engineers at $1.25 million a piece to reach his $155.7 million total. Ex. 44, pp. 17–25.

According to Mr. Wagner, the key driver of value and the primary purpose of the Transaction was *access* to the 3dfx engineering talent. 3dfx had provided confidential information regarding certain of its employees and had given nVidia the opportunity to be the first company to be able to make employment offers to them as an "intact, cohesive engineering team." Ex. 44, p. 18. To arrive at a value for this group of 100 engineers, Mr. Wagner stated that using the price-per-engineer was a common valuation metric widely employed by a variety of reputable companies and investment banks during this time period.[24] Ex. 44, p. 18.

As Morgan Stanley had done with the seven transactions listed in the Project Titan Materials, Mr. Wagner compiled a list of twenty-three transactions that had taken place between July 1997 and December 2003. He testified that in these transactions, the "value attributable to each *engineer* is calculated by dividing the acquisition price by two (implicitly assuming that half the value is *engineers*) then dividing by the number of *engineers* acquired." Ex. 44, p. 19.

The "value per engineer" in these twenty-three transactions ranged from $250,000 (Chromatic acquired by ATI in October 1998) to $13 million (Cerent acquired by Cisco in August 1999) and the average was $2.36 million. Mr. Wagner concluded that based on this *average* engineer valuation, in this Transaction, "the engineers alone were worth $236 million." However, Mr. Wagner stated that from his research, $1.25 million per engineer was a fair valuation for "the engineers transferred" from 3dfx to nVidia. Ex. 44, p. 22.[25]

With reference to the applicable definitions in the UFTA and fraudulent conveyance law, Mr. Wagner was asked whether engineers were assets subject to ownership and transfer, and whether he had valued them objectively from the standpoint of creditors, without taking into account any subjective value peculiar to nVidia. In response, he stated:

A: That's correct. But I want to make sure that you understand what I meant by 'engineers' ... I used the shorthand 'engineers.' What I mean by that is the right to recruit an organized, skilled workforce, and you have the benefit in your company.[26]

---

24. The sources for this concept identified in Mr. Wagner's Report are articles published between October 1999 and November 2001 in Fortune Magazine, Financial News, M2 Presswire, TheStreet.com. Ex. 44, pp. 18–20. The Court doubts these sources would be considered peer reviewed literature. No further support is provided for the conclusion that this was a "common" approach to *arrive* at a business valuation—as opposed to a number *derived* from a market valuation arrived at through some other means.

25. No research other than the twenty-three transactions is identified in the Report.

26. Mr. Wagner viewed the *benefits* of the Transaction to nVidia as equivalent to the *assets* transferred by 3dfx to nVidia. Ex. 43,

Q: So it is not the engineers themselves; it is something else?

A: Absolutely ... The million dollars is the present value of the future earnings of that engineer at that new company based on the engineer's experience, the engineer's being able to use the know-how they had before, using the trade secrets they've learned in their career, to have projects that they know what they're dealing with and can work with other members of a team. All of that is in my number.

Q: Okay. It is not the engineers themselves?

A: It is not the engineers themselves.

RT 1023.

Later, in an apparent attempt to clarify, Mr. Wagner stated that by using the term engineers in his Report and Declaration, he meant the organized workforce which in turn meant the technology, the know-how, and the associated bundle of rights that went with the workforce—essentially all of the intellectual property except the Patents. RT 1196.

At the end of his testimony, Mr. Wagner stated that he had not just blindly adopted the $2.36 million average price per engineer from his collection of twenty-three transactions but had used his judgment based on his experience to adjust it downward because of the risk that the engineers would not accept nVidia's offers. Mr. Wagner also acknowledged that this risk analysis or risk adjustment is nowhere articulated in his Report or Declaration but insisted that he had considered this risk and that such a risk analysis was implicit. RT 1231–1233.

¶ 25; RT 1027. Benefits may not always be assets, especially in a fraudulent conveyance

## D. The Four Issues Tried

### 1. Introduction

The parties disagreed on what was to be valued—a collection of assets or a business (including its intellectual property, goodwill, and workforce). According to nVidia, the Transaction was an asset sale in which the Specified Assets had a fair market value of $13.4 million for which nVidia paid $70 million based on its own strategic motivations and the fact that nVidia believed it was in a competitive bidding environment. According to the Trustee, the Transaction amounted to the sale of a business or business unit with a fair market value of $140 million for which nVidia paid $70 million to the detriment of the 3dfx creditors.

There is no real dispute that certain of the Specified Assets were transferred, and that they come within the definition of an asset in the UFTA. With the exception of the Trademarks, there is also no real dispute as to the fair market value of these assets. Because the parties' views as to these particular tangible and intangible assets do not differ greatly, they will be discussed and disposed of here.

### 2. Areas of Agreement

#### a. Inventory, Equipment and Other Tangible Assets

nVidia management had indicated that the Inventory, Equipment and Other Tangible Assets had a net book value of $2,432,500. Mr. Wagner and Mr. Grabowski both accepted this net book value as the fair market value. Accordingly, the Court will accept this uncontested valuation of the Inventory, Equipment and Other Tangible Assets at $2,432,500.

context.

### b. Patents

Both Mr. Grabowski and Mr. Wagner concluded that the Patents (other than those involved in the Patent Litigation) had a fair market value of $5 million. Mr. Grabowski relied on the fact that nVidia proposed to make only defensive use of the Patents rather than a use that would have generated any revenue stream. Mr. Wagner adopted nVidia's valuation of the Patents without any independent analysis. The two experts thus essentially agreed that the fair market value of the Patents was $5 million.

### c. Trademarks

Mr. Grabowski concluded that the fair market value of the Trademarks was immaterial because no significant cash flows would be generated from their use. Mr. Wagner simply adopted the D & T valuation of $11.310 million which was based on D & T's analysis of expected cash flows.

■■■ The Court finds the D & T valuation convincing because it was performed in advance of any litigation and was based on facts known or knowable at the time of the Transaction. At the time, nVidia had indicated it planned to exploit these Trademarks. All of Mr. Grabowski's points may be valid, but in this setting, his conclusion is not persuasive. Accordingly, the Court finds that the fair market value of the Trademarks for present purposes is $11,310,000.

### d. Settlement of the Patent Litigation

Mr. Grabowski offered the only analysis of the Patent Litigation claims in which they were treated as an asset for purposes of a fair market value determination in a fraudulent conveyance context. Mr. Grabowski concluded that the Patent Litiga-

tion claims had a fair market value of $5 million. Once again, Mr. Wagner did not perform any independent analysis of the value of the Patent Litigation claims and merely adopted the analysis of nVidia's management that the settlement of the Patent Litigation claims was worth $12 million.

Paul Carmichael, nVidia's intellectual property lawyer, testified that he had advised the nVidia board that the potential maximum damage exposure was approximately $10 million plus an additional $2 million for nVidia's attorneys' fees. He reached this conclusion by applying a 2% royalty rate to $500,000 in revenues from sales of allegedly infringing products. Ex. CA, ¶¶ 28–29.[27]

The Court concludes that assigning $12 million for the settlement of the Patent Litigation claims is appropriate even though this does not treat the Patent Litigation claims as an asset and does not assign a value equivalent to the apparent market value of the Patent Litigation claims. The Court believes that nVidia arrived at the $12 million figure in good faith and factored that analysis into its negotiations with 3dfx. While this conclusion does not treat the Patent Litigation claims as an asset transferable for a fair market value, this conclusion respects the parties' desire to settle. While Mr. Grabowski's valuation may be analytically correct, the Court finds that $12 million was the value of this settlement of the Patent Litigation claims in the context of this case.

### 3. Areas of Disagreement

#### a. Did 3dfx Transfer a Graphics Business?

■■■ The Trustee contends that in the Transaction 3dfx transferred a graphics

---

**27.** *See also* Exs. CC, AJ, BS regarding patent infringement damages.

business or business unit including its workforce, its intellectual property and its economic goodwill. nVidia contends that no graphics business, as such, was transferred for several reasons including the fact that this was an asset sale and 3dfx did not have a graphics business at the time of the Transaction.

Resolution of this issue requires a review of language in the APA, the opinions of the industry and valuation experts, the testimony of the witnesses actually involved in running 3dfx, and certain accounting definitions and rules.

### 1. The Language in the APA

The APA describes the Specified Assets as all properties, rights, interests and other tangible and intangible assets that *are or were* used in or that otherwise directly or indirectly relate to, the *graphics business* of the Seller Corporations. Ex. 5047, pp. 1–2. The Trustee contends that this language in the APA and language in § 2.16 and in § 4.2 show that a business was transferred.

 The APA is governed by Delaware law. Ex. 5047, § 11.8. Under Delaware law, if contract terms are ambiguous (that is, susceptible to different interpretations), the Court may consider extrinsic evidence of the shared expectations of the parties at the time of formation. On the other hand, if the terms are clear, the Court is to apply the meaning that would be ascribed by a reasonable third party.

*Comrie v. Enterasys Networks,* 837 A.2d 1, 13 (Del.Ch.2003).

Because the APA language [28] may be susceptible to different meanings, the Court will consider the evidence regarding the shared expectations of the parties. nVidia asserts that it was not its intention to acquire the 3dfx *business.* Ex. BT, ¶ 32; RT 98, 573.[29] The minutes of the 3dfx board meetings regarding the Transaction indicate that 3dfx intended to enter into an asset sale. The discussions of the 3dfx board do not indicate an intent to transfer a business or a workforce. See Exs. 5027, 5029, 5033, 5039, 5040, 5050. In addition, the S–4 Proxy Statement by which 3dfx solicited shareholder approval of the Transaction and the Plan of Dissolution clearly describes an asset sale and nothing else. Exs. 5057, 5060. Mr. Leupp's testimony does not provide any support for the Trustee's theory that a transfer of a business was intended from the 3dfx side of the table.

A reasonable reading of the APA is that the defined terms Specified Assets and Excluded Assets were used to differentiate between the two essential functions of the Seller Corporations—designing graphics chips and building and selling add-in boards incorporating them. The terms Specified Assets and Graphics Business refer to a collection of assets that had been or were used in connection with the conduct of 3dfx's *former* business—the merchant chip business conducted before the merger with STB. The term Excluded As-

---

28. The documentation for this complex transaction was drafted over the course of less than a five days and many of the essential terms continued to evolve up until the last possible moment. Ex. CE, ¶ 25. To some extent, drafting errors or internal inconsistencies are to be expected.

29. In fairness, Mr. Huang stated in a December 17, 2000 email to his staff: "We essential-ly bought 3dfx but without the massive liabilities and significant management distraction to shut it down." Ex. 15. Taken in context, this statement appears to the Court to be largely hyperbole. Whether taken in isolation or in context, this statement is incapable of transforming an asset purchase into something else when weighed against competing evidence of greater probity.

sets refers to the assets used in connection with the add-in board business 3dfx conducted following the STB merger. Based on the language in the APA and the testimony of those involved, finding that the Transaction was structured to transfer a business is an interpretive leap the Court is not willing to make.

### 2. The Experts' Definitions of a Business

Mr. Wagner did not define what he meant by the term business in his Declaration or his Report. However, at trial Mr. Wagner testified that, in general, to constitute a business, an enterprise needs a product, sales, sales people, a marketing function, a human resources function, legal, accounting, and finance departments, managers for these various functions, a physical location, people to handle customer relationships and various distribution channels. RT 974–976. Mr. Grabowski agreed with this list. Ex. BW, ¶ 48.

Mr. Murphy, nVidia's investment banking expert, testified that a business:

[has] many, many parts that are synergistically intertwined and create an entity that is greater than ... those parts taken unto themselves. It has, therefore, enterprise value, sometimes referred to as 'going-concern' value where the assets in employment in that enterprise are considered to have their highest and greatest value. But it is fundamentally an entity that has a continuing sustaining operating ability; an ability to pay its debts, ability to generate revenues, new customers, new products. All of those things are part of an organic whole that define a business as opposed to simply a collection or list of assets. RT 1580.

Mr. Ferraro and Mr. Peddie, the two industry experts, offered contradictory opinions. Richard Ferraro,[30] the Trustee's industry expert, offered his opinion that 3dfx and nVidia were in the same "graphics controller business" because "the graphics controller business of 3dfx was the development of high performance graphics controller chips and device driver software that enable realistic 3D experiences across multiple hardware platforms" and the "graphics controller business" of nVidia is the "development of high performance graphics controller chips and device driver software that enable realistic 3D experiences across multiple hardware platforms." nVidia acquired "the graphics controller business of 3dfx and continued it by integrating 3dfx's intangible assets and assembled workforce into the graphics controller business of nVidia." Ex. 2, p. 25.

Mr. Peddie, nVidia's industry expert, testified that 3dfx did not have a graphics business because it was no longer a merchant chip company by the time of the Transaction in December 2000. After the STB merger in mid–1999, 3dfx had become an add-in board company. While 3dfx may have designed graphics chips, 3dfx's revenues were derived solely from the sale of its board products.

Mr. Peddie also testified that a viable graphics chip business would have had personnel to perform the following critical and highly specialized roles: chip product managers, chip marketing managers, application engineers, a testing department, employees devoted to producing reference design and manufacturing kits, and specialized personnel to maintain customer relationships with different graphics board manufacturers. RT 1470–1482. There was no evidence that 3dfx had such specialized personnel.

---

30. See Addendum A to Ex. 2 for complete details regarding Mr. Ferraro's credentials.

In brief, Mr. Ferraro is an electrical engineer in the field of computer graphics.

Mr. Ferraro's conclusion essentially begs the question. Mr. Ferraro first defines nVidia's business the same way he defines 3dfx's business and then claims that nVidia continued that business because nVidia acquired 3dfx's intangible assets and its workforce. The discussion in Mr. Ferraro's report sheds no light on these conclusions. This testimony carries no probative weight. On the other hand, Mr. Peddie's analysis is supported by the testimony of the former principals of 3dfx. Mr. Leupp testified that when 3dfx purchased STB, 3dfx became an add-in board company and made chips only for these boards. Ex BV, 15; RT 1290. Mr. Leupp also testified that 3dfx needed $80 million to return to its "former business model" of designing and selling graphics chips to third parties. Instead, having found no partners, investors, or funding for that pursuit, 3dfx made the decision to enter into the Transaction and dissolve. Ex. BV, ¶¶ 35–36; Ex. BU, ¶ 8.

The credible evidence leads only to the conclusion that at the time of the Transaction, 3dfx operated with STB as a unified company in most essential respects and while 3dfx designed graphics chips, it incorporated them into its own boards and sold only its own boards. There was no evidence that 3dfx had any personnel to perform the critical specialized functions of a graphics business identified by Mr. Peddie. Mr. Leupp and Mr. Carmack, the two witnesses with first-hand knowledge of 3dfx's operations, corroborated this position. Mr. Ferraro's assertion that possession of a graphics design function is equivalent to the conduct of a graphics business is simply not convincing. 3dfx may have had assets related to graphics design and employees involved in that function, but that is not sufficient for a finding it had a graphics business. As an "organic whole," 3dfx functioned as an add-in board company.

### 3. The Accounting Definitions of a Business

The Trustee's argument that the Transaction accomplished the sale of a business also rests on the definition of a business in EITF 98–3. EITF 98–3 defines a business as a self-sustaining integrated set of activities and assets conducted and managed for the purpose of providing a return to investors. Further,

[a] business consists of (a) inputs, (b) processes applied to those inputs, (c) resulting outputs that are used to generate revenues. For a transferred set of activities and assets to be a business, it must contain all of the inputs and processes necessary for it to continue to conduct normal operations after the transferred set is separated from the transferor, which includes the ability to sustain a revenue stream by providing its outputs to customers.

Ex. P, ¶ 6.

EITF 98–3 defines inputs as including long-lived assets, intellectual property, access to materials or rights, and employees. EITF 98–3 also states:

[a] transferred set of activities and assets fails the definition of a business if it excludes one or more of the above items such that it is not possible for the set to *continue* normal operations and *sustain* a revenue stream by providing its products and/or services to customers.

Ex. P, ¶ 6. (*See also* Reg. S–X, Rule 11–01, 17 C.F.R. § 210 containing a similar definition.) EITF 98–3 also provides that if goodwill is present in a transferred set of activities and assets it should be presumed that the transferred set is a business. Ex. P, ¶ 6.

As discussed above, in general, the accounting rules are not helpful in the context of determining solvency and the Court

does not believe them to be helpful in the context of defining what is an asset or determining the fair market value of it. *See In re Kaypro*, 230 B.R. at 413; *In re Sierra Steel Inc.*, 96 B.R. at 278; *In re EBC I, Inc.*, 380 B.R. at 358; *In re Richmond Produce Co., Inc.*, 151 B.R. at 1019.

Mr. Weil, nVidia's accounting expert, also cast doubt on D & T's terminology and how KPMG had applied the accounting rules to the facts of the Transaction. Mr. Weil's explanation, which is consistent with the authority limiting the role these accounting rules play in this context, undermines the result urged by the Trustee.

Mr. Weil testified that a careful examination of the facts would have shown that this accounting definition of a business did not apply. nVidia could not continue 3dfx's normal operations because it had not purchased its factory and did not succeed to 3dfx's contracts with 3dfx's chip fabricators; nVidia could not sustain 3dfx's revenue stream because the 3dfx revenue stream was from the sale of add-in boards rather than the sale of graphics chips; and nVidia did not acquire or succeed to 3dfx's sales, distribution or marketing channels, or continue to support 3dfx products or sell its products to 3dfx's customers. Ex. BX, ¶ 21.

Mr. Weil's assessment of the facts is consistent with the testimony of Mr. Leupp and Mr. Carmack and is consistent with the testimony of Mr. Peddie and Mr. Murphy. After the STB merger in 1999, the 3dfx revenue stream was almost entirely from the sale of its own boards. Ex.

Q, p. 9. There is no evidence that nVidia undertook the board business and there is no evidence that nVidia sold products through 3dfx's sales or marketing channels or exploited the Voodoo tradename directly or by licensing it to third parties.

After giving due consideration to the Trustee's argument that the Transaction accomplished the transfer of the 3dfx graphics business or business unit, and the evidence presented at trial, the Court concludes that the Trustee has failed to meet his burden of proof on this issue.

### b. Did 3dfx Transfer a Workforce?

■ The Trustee argues that the APA was *designed* to accomplish the transfer of the 3dfx skilled workforce as part of the business or business unit. Ex. 43, ¶ 56. In the alternative, the Trustee claims that a workforce was transferred separate from the business that employed it.[31]

There is no question that hiring 3dfx engineers was nVidia's goal and nVidia achieved that goal. Ex. BT, ¶¶ 24–25, 29, 35. However, nVidia disputes that the hiring it did amounts to the acquisition of a workforce either as part of the Transaction or in connection with it and asserts that employees are not intangible assets.

The Trustee does not define what he means by the term workforce.[32] nVidia offers two dictionary definitions: "[a]ll the people working or available to work, as in a nation, company, industry, or on a project," and "the total number of workers in a specific undertaking" or "the total number of persons employed or employable."[33]

---

**31.** The Trustee has offered no authority for the proposition that a workforce may be transferred outside of the transfer of a business itself. The concept seems farfetched if the employees are at-will employees as they were here.

**32.** In the tax context, the issue revolves around whether a workforce is an asset sub-

ject to depreciation. *See Ithaca Indus., Inc. v. Comm'r of Internal Revenue*, 17 F.3d 684, 690 (4th Cir.1994).

**33.** Dictionary.com Unabridged (v.1.1), Random House, Inc., *http://dictionary.reference. com/browse/workforce; The American Heritage*

nVidia asserts that at the time of the Transaction, 3dfx had approximately 650 employees of whom approximately 265 were engineers. After December 15, 2 000, nVidia made offers to approximately 122 of the engineers based on nVidia's internal staffing needs and hired approximately 100 of them. These new employees came to nVidia as a result of individual recruiting efforts, generous signing bonuses and pay raises. In the final iteration of the Transaction documents, nVidia took the risk that its recruiting efforts would not succeed: there was no adjustment of the purchase price based on a failure to hire a certain number as there had been in early versions of the term sheets.

In support of his argument that a *workforce* is an asset subject to transfer, the Trustee relies primarily on *Glosband v. Watts Detective Agency, Inc.*, 21 B.R. 963 (D.C.Mass.1981), *aff'd Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729 (1st Cir.1982). nVidia counters with *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358 (9th Cir.1997) and *Orthotec, LLC v. REO Spineline, LLC*, 438 F.Supp.2d 1122 (C.D.Cal.2006).

In *Robinson*, a bankruptcy trustee sued the former principals of the debtor's security guard business on a breach of fiduciary duty theory and sued the acquiring company on a fraudulent conveyance theory. *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d at 731. A jury found defendants liable for breach of fiduciary duty and determined that the debtor's operating business (which the jury found had going concern value) had been transferred to the acquiring company for no consideration. *Id.* The district court and the First Circuit refused to overturn the jury's verdict or the jury's factual findings. *Id.* at 731–32, 34–35, 37, 40–41. The district court focused on the fact that the jury could have found

there had been a continuity of operations from the debtor, Sullivan Co., to the transferee, Watts. *Id.* at 734–35. The First Circuit affirmed, concluding:

> [T]he jury could have found on this evidence that, in hiring Otte, Watts effected the transfer of precisely that for which it had been bargaining previously with Otte and Sullivan and had been prepared, until the previous day, to purchase—the operating portion of the Sullivan Company business—and that this package was acquired by Watts ... [.]

*Id.*

The First Circuit also declined to disturb the jury's determination that Sullivan Co. had been a going concern at the time of the transfer. *Id.* at 735.

The Trustee's reliance on this case for the proposition that a workforce is an asset that can be transferred is misplaced. On the specific facts as found by the jury in *Robinson,* one *business* was transferred for no consideration to another—the day after an offer of roughly $130,000 had been made. *Id.* at 732–33.

The district court stated that "the aggregate of a business' employees, even if they be individually not property, is 'property' within the meaning of the Bankruptcy Act." *Glosband v. Watts Detective Agency, Inc.*, 21 B.R. at 972. This statement does not compel a conclusion one way or the other on the facts of this case. Here, nVidia clearly wanted to hire engineers, but nVidia did not acquire the "aggregate" of 3dfx's employees. nVidia hired less than 16% of the 3dfx employees and less than 38% of the engineers.

nVidia distinguishes *Robinson* on its facts and asserts that the clear Ninth Circuit authority of *Atchison* and *REO* supports nVidia's position on this issue. In

*Dictionary of the English Language,* Fourth Ed. (2006).

*Atchison,* railroads had leased real property to Brown & Bryant ("B & B"), a family owned agricultural chemical company. *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d at 360. Two of B & B's sites were contaminated and B & B was financially unable to complete the clean up work ordered by state and federal agencies. *Id.* B & B hired a broker to appraise its assets and contact competitors interested in purchasing them. *Id.* PureGro, one of B & B's competitors, paid the appraised value for the assets, hired 60% of B & B's employees, took over B & B's phone numbers and entered into a consulting agreement with B & B's former principal. *Id.* at 360–61. In addition, PureGro hired all of B & B's pest control advisors (the "PCAs")—the employees whose role was to work closely with farmers so that most farmers bought their chemicals from the retailer with whom the PCA was affiliated. *Id.* at 361. The railroads sued PureGro, on the theory that the asset sale was equivalent to a fraudulent conveyance in that inadequate consideration had been paid or that PureGro was a "continuation" of B & B. *Id.*

The district court granted summary judgment for PureGro. *Id.* On appeal, the railroads argued that there was a triable issue of fact because PureGro had actually acquired B & B's goodwill without paying for it which meant that PureGro had paid less than reasonably equivalent value for the assets. *Id.* at 365. The Ninth Circuit rejected this argument:

[N]inety percent of the time, clients follow PCAs, and PureGro merely offered employment to PCAs that would be out of work when B & B closed its doors. No agreement between PureGro and B & B required PureGro to employ the PCAs. The fact that PureGro managed to sign the PCAs and thus gain their attendant business rather than allowing a competitor to employ them is not rele-

vant to the fraudulent transaction issue. The district court properly recognized that the PCAs had to find employment somewhere and that PureGro was fortunate to have hired them.

*Id.*

In *REO,* plaintiff also sought to hold an asset purchaser liable on a de facto merger or mere continuation theory. *Orthotec, LLC v. REO Spineline, LLC,* 438 F.Supp.2d at 1128. Plaintiff contended that defendant Theken had obtained defendant REO's principle intangible assets—its sales personnel, a network of distributors and a base of operations—for an inadequate price. *Id.* at 1129–30, 33. The court rejected this argument, stating that the employees that Theken had hired were not intangible assets. *Id.* at 1129–30. The employees had been told they were about to be terminated, and there were no employment agreements prohibiting them from becoming Theken employees. *Id.* at 1129.

Relying on the holding in *Atchison,* the district court stated, "[Theken's] mere hiring of former REO employees, absent any allegations or evidence of an assignment of contract, is not considered a transfer or acquisition of REO's assets." *Id.* at 1130.

The authority of *Atchison* and *REO* is controlling here. The facts in these two cases are far closer to the facts before this Court than are the facts in *Robinson.* In *Robinson,* the jury found that there had been the transfer of the debtor's business as a going concern—the security guards employed by the debtor continued to provide guard service on an uninterrupted basis from one day to the next. *Robinson v. Watts Detective Agency, Inc.,* 685 F.2d at 734–35. The jury also found that, following the transfer, the transferee had collected $680,000 from providing guard services on accounts that the transferee

had obtained from the debtor. *Id.* at 740. Both the reviewing courts refused to disturb these findings on appeal. *Id.* at 743. In *Atchison,* as in this case, there was an asset sale, following which the selling company closed, and its terminated employees were hired by the purchaser. *Atchison, Topeka & Santa Fe R. Co. v. Brown & Bryant, Inc.,* 159 F.3d at 360–61. In *REO,* defendant also hired terminated employees after their employer shut down. *Orthotec, LLC v. REO Spineline, LLC,* 438 F.Supp.2d at 1125–28. In both these cases, the courts refused to find the newly hired employees were intangible assets or embodied the goodwill of the former employer. *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d at 365; *Orthotec, LLC v. REO Spineline, LLC,* 438 F.Supp.2d at 1129–30. The courts rejected the arguments that the purchasers had paid inadequate consideration. *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d at 365; *Orthotec, LLC v. REO Spineline, LLC,* 438 F.Supp.2d at 1133.

While hiring former 3dfx engineers was one of nVidia's stated goals, the hiring that took place is simply not equivalent to the security guards continuing to arrive at their assigned workplaces on different nights of the week as in *Robinson.* It is, however, in line with the hiring that took place in *Atchison* and *REO.* The Ninth Circuit authority of *Atchison* supports nVidia on this issue. The selected group of engineers nVidia hired was not, by any definition, a workforce, and the engineers are not an intangible asset under controlling Ninth Circuit authority.

### c. Did 3dfx Transfer Goodwill?

 The Trustee's Pre–Trial Brief argued that "[e]conomic goodwill, encompassing the employee related assets and other general intangibles, was transferred by 3dfx to nVidia. nVidia admits this in its contemporaneous communications to the SEC and with the investing public and by continuing to carry 3dfx goodwill as an asset." Docket no. 367, Trustee's Pre–Trial Brief, p. 15. By the phrase economic goodwill, the Trustee meant a greater than normal earning power or return, as distinguished from accounting goodwill, as D & T had used that term to describe the residual number in its purchase price allocation discussed above.

The Trustee's Post–Trial Brief argued that the Trustee had proven that the $90 million described as goodwill in D & T's purchase price allocation was not a mere residual or "plug number" as nVidia claimed (and as D & T had stated), but represented valuable economic goodwill which nVidia was attempting to re-characterize as a mere plug number. The Trustee argued that under "applicable accounting rules, if recorded goodwill is deemed to be worthless (*i.e.,* a mere plug number), nVidia would have been prevented from carrying it as an asset on its balance sheet." The Trustee also argued, in a somewhat circular fashion, that this transfer of economic goodwill corroborated his theory that a business unit was transferred. Docket no. 452, Trustee's Post–Trial Brief, pp. 22–23.

Mr. Weil testified that in his opinion, D & T should not have used the term goodwill. Instead, D & T should have used the more accurate description "unidentifiable intangible assets." Ex. BX, ¶¶ 20, 33–36. Mr. Maxson, who did the work for D & T, testified that the $90 million figure was the residual number that remained after allocating the Cash Consideration to certain tangible and intangible assets and was not a recognition that there was "economic goodwill" as the Trustee uses that terminology. He testified that the $90 million labeled as goodwill did not indicate an

expectation of continued patronage or greater than normal earning power, and it was not an appraisal of goodwill. RT 1371. Mr. Maxson confirmed Mr. Weil's assessment that use of the term goodwill may have been a misnomer and a more accurate description would 25 have been unidentifiable intangible assets.

Mr. Weil also testified that the presence of goodwill on nVidia's 2005 10–K means simply that the book value of the goodwill is less than the fair value of the reporting units to which nVidia has assigned it as required by current impairment testing rules. RT 297–298, 407–415, 417–418. Mr. Weil tracked D & T's initial $90 million number from the date of the Transaction to its appearance in nVidia's 2005 10–K. Ex. EW, Ex. 5099, RT 410–413. Mr. Weil testified that the presence of goodwill does not indicate anything about nVidia's current view of the assets it obtained from 3dfx in the Transaction—it only indicates the performance of the business units within nVidia to which the goodwill (or unidentifiable intangible asset) was allocated. RT 409–414.

Unfortunately, the Trustee misunderstands the relevant accounting concepts. The Trustee's theory that the presence of this goodwill on nVidia's balance sheet is an indication that nVidia purchased a business has no merit. In light of the above, the Trustee has failed to meet his burden of proof that economic goodwill was transferred in the Transaction.

## E. Valuation Issues

Because the Court has concluded that the Transaction did not transfer a graphics business, business unit, workforce, or goodwill (in the sense in which the Trustee uses the term), there is no need for a

lengthy discussion of the Trustee's valuation theory. Nevertheless, the Court will briefly explain why Mr. Wagner's valuation theories are not credible.[34] Even if the Court were to have reached contrary conclusions regarding what was transferred and its avoidability, there is no valuation evidence upon which the Court could have reached the conclusions urged by the Trustee.

## 1. Buyside Valuation

■ The Court gives no credence to Mr. Wagner's buyside valuation. In this exercise, he looked to several documents which he contended were valuations of 3dfx assets which he then adjusted to achieve a valuation range from $108 million to $114 million. Ex. 44, pp. 14–15, Ex. 1, Schedule 2.1.

■ Fair market value, as explained by Mr. Wagner himself at trial, is what a hypothetical willing buyer and seller agree upon when possessed of relevant facts. The considerations of the actual buyer or seller are irrelevant. Nevertheless, in this valuation analysis, Mr. Wagner looked only at indications of value from nVidia's views of several different potential transactions, each based on nVidia's own strategic considerations. To further undermine this approach, Mr. Wagner acknowledged at trial that nVidia was willing to pay what it did based on synergies that nVidia thought it could achieve in the Transaction. RT 938–939.

A review of each element in this buyside exercise reveals its flaws. There is no evidence that the $99 million offer was ever sent and an offer is not the same as valuation analysis. The $100 million offer was for a different deal structure—which

---

**34.** Mr. Wagner's approach to valuation required an *ex ante* point of view pursuant to which events occurring after the December

15, 2000 valuation date were to be used as a reasonableness check only. RT 922–925.

was rejected by 3dfx. Exs. 5033, 5035. The nVidia internal presentation was based on a valuation metric Mr. Wagner acknowledged on cross examination was not a fair market valuation. RT 1528, 1625. The Project Titan Materials were prepared before nVidia's first offer was made and were not intended by Morgan Stanley to elucidate a fair market value. RT 953–955; Ex. BY, ¶¶ 16, 19–29. Mr. Wagner acknowledged at trial that the $108 million in the HSR Notification was not a statement of fair market value. RT 952. Finally, the $107–$114 million in possible consideration in the APA (the Cash Consideration and the Stock Consideration) is not a valuation—it is the purchase price nVidia agreed to pay and 3dfx agreed to accept—upon the occurrence of certain conditions. However, it ignores the fact that payment of the Stock Consideration was contingent and the contingencies have not been met. RT 936–940.

 In addition, in this buyside exercise, Mr. Wagner ignored a basic valuation principle which he articulated at trial: the question to be answered is value to whom and for what purpose. In the fraudulent conveyance context, the focus is on value to the creditors of 3dfx. The question is—has the estate been depleted in some way as a result of the Transaction? The answer to this question is not found in nVidia's internal documents or in offers that may have been made and rejected. The task is to determine the objectively reasonable value of the property involved in the Transaction. Thus, while the purchase price may be relevant, this part of Mr. Wagner's valuation opinion is simply not persuasive. nVidia's internal analyses of its objectives, and the initial term sheets exchanged by the parties do not meet the criteria for a valuation analysis.

This buyside exercise also ignores the actual market that existed at the time of the Transaction and the fact that a serious effort had been made to find buyers, investors or strategic partners of any sort for all or part of 3dfx. Mr. Wagner acknowledged that Robertson Stephens's legitimate and competent efforts only turned up one other party interested in a potential transaction—Via. Via offered a maximum of $40 million for essentially the same assets for which nVidia agreed to pay $70 million. Mr. Wagner also acknowledged that the technology sector was having trouble at the time since the "internet bubble" had burst earlier in 2000. RT 929; 1138. The Trustee's claim that this buyside valuation is "market based" is nonsensical in light of the fact that the only other offer to have emerged as a result of Robertson Stephens's competent and thorough marketing efforts was for a maximum of $40 million for essentially the same assets.

### 2. Implied Market Capitalization

 In this approach to valuation, Mr. Wagner calculated a value for 3dfx based on 3dfx's share price before the announcement of the APA and then extrapolated a value of $151 million for the assets acquired by nVidia in the Transaction. Mr. Wagner claims the fact that the 3dfx share price dropped after the public announcement of the Transaction indicates underpayment by nVidia. The Court gives no credence to Mr. Wagner's implied market capitalization method.

nVidia points out that the public first learned that 3dfx had signed the APA and made the decision to dissolve at nVidia's Monday December 18, 2000 investor conference call and first learned the extent of the negative information about 3dfx's financial condition when 3dfx filed its 10–Q after the market closed on December 20, 2000. Ex. 5054; RT 1012.

■ nVidia argues that to assume the drop in share price is attributable to underpayment is simply not supported by any credible analysis—it rests only on Mr. Wagner saying it is so. An expert's *ipse dixit* is insufficient. *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

In the securities fraud context, where damages are measured by the price at which a stock sold and the price at which the stock would have sold absent alleged wrongdoing, it is essential to isolate what portion of a price decline may be tied to the alleged wrongdoing. *See In re Imperial Credit Indus., Inc. Sec. Litig.,* 252 F.Supp.2d 1005, 1014–1015 (C.D.Cal.2003), *aff'd sub nom., Mortensen v. Snavely,* 145 Fed.Appx. 218 (9th Cir.2005).

While this is not a securities fraud case, this approach seems relevant. Mr. Wagner did not perform an event study or similar analysis which might have isolated whether the drop in 3dfx share price was attributable to factors other than the announcement of the Transaction. Mr. Wagner simply attributes the decline in stock price to one cause and has presented no analysis to support or confirm that conclusion.

On cross-examination, Mr. Wagner acknowledged that as of December 14, 2000, many essential and damaging facts about 3dfx were still unknown and the stock price would have reflected this.[35] For example, the public did not know that 3dfx had consulted bankruptcy counsel and there was a likelihood that 3dfx would file bankruptcy if it did not sell assets and arrange for a prompt cash infusion. The public did not know that 3dfx's cash would be exhausted by mid-December and that 3dfx was at risk of not meeting payroll. The public did not know that 3dfx had suffered a loss of $178.5 million on revenues of $39 million for the period ending October 31, 2000; nor did the public know that net working capital was negative $3.9 million. The public first learned all of these facts after 3dfx filed its 10–Q on December 20, 2000. RT 1005–1009, 1254, 1257.[36]

On this record, there is no support for a finding that this decline in stock price indicates underpayment by nVidia. Nor is there a basis to conclude that whatever the Transaction involved may be valued at $151 million. The Court finds this analysis unpersuasive.

### 3. The Sum of the Parts

■ Under the sum of the parts approach, Mr. Wagner assigned values totaling $31 million to the tangible and intangible assets discussed above. He then assigned a value of $1.25 million a piece to *100 engineers* to reach his $156 million total.

As he described this valuation metric,

[d]uring the relevant time period, acquisitions of *companies* with no profitable business were driven by the desire to obtain scarce engineering talent. Using the price-per-engineer was a common valuation metric widely employed by a variety of reputable companies and investment banks ... *The value attributable to each engineer is calculated by dividing the acquisition price by two*

---

**35.** The 3dfx stock price had been in a steady decline since at least November 2000, slipping from $4.52 on November 8, 2000 to $1.94 on December 14, 2000 and $1.78 on December 15, 2000. *See* Ex. 44, Schedule 5.

**36.** Mr. Wagner acknowledged that the 3dfx closing price on December 18, 2 000 was 13 cents a share—for a market capitalization of $7.4 million and dropped to 9 cents a share on December 21, 2000 for a market capitalization of $3.5 million. RT 1012.

*(implicitly assuming that half the value is engineers) then dividing by the number of engineers acquired.*

Ex. 44, pp. 18–19 (emphasis added).

Mr. Wagner compiled a list of twenty-three transactions (each admittedly involving a merger or change-of-controlling interest), from which he extrapolated per engineer multiples ranging from $250,000 to $13 million. Ex. 44, pp. 17–21, Schedule 4.1. Based on this data, he concluded that $1.25 million each is a "fair valuation of the engineers transferred" to nVidia. Ex. 44, p. 22. Mr. Wagner stated that the Project Titan Materials in which Morgan Stanley had suggested a value range of $1.0 to $1.5 million per engineer confirms the reasonableness of his $1.25 million multiple.[37] Ex. 5028, p. 13; Ex. 43, ¶¶ 63–64.

The Court finds this part of Mr. Wagner's opinion deeply flawed. Assuming use of such a rule of thumb approach might be appropriate, its use here is not in compliance with the governing principles for expert testimony in Rule 702. Mr. Wagner's opinion is not based on sufficient facts or data; it is not based on reliable principles or methods; and he did not apply the principles or methods reliably to the facts to reach his conclusion. *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786; *Joiner,* 522 U.S. at 146, 118 S.Ct. 512; *Chartwell Litig. Trust, v. Addus Healthcare, Inc. (In re Med Diversified, Inc.),* 346 B.R. 621, 629 (Bankr.E.D.N.Y.2006).

First, it is unclear what Mr. Wagner is valuing at $125 million—is it people, technology, a business or business unit, or something else? Mr. Wagner's Declaration and his Report state that the 100

engineers were worth $1.25 million a piece. However, at trial, Mr. Wagner stated that when he used the word engineer, he really meant the 3dfx engineering workforce by which he may have meant the access to recruit the engineers, but he may also have meant the technology, know-how, in-process research and development and trade secrets that accompanied the engineers when they became employees of nVidia. RT 1023 (engineers means the right to recruit an organized, skilled workforce); RT 1131 (metric is for valuing the technology of the company being transferred).

Second, is there any relationship between the twenty-three transactions from which Mr. Wagner's data is derived and the instant Transaction? *See Celebrity Cruises, Inc. v. Essef Corp.,* 434 F.Supp.2d 169, 180 (S.D.N.Y.2006). In other words, does he start with reliable facts? On a fundamental level, the twenty-three transactions from which Mr. Wagner extrapolates values are not comparable to the Transaction because each involved a merger in which the succession to employment relationships was a given. RT 1126. As such, the risk of success in hiring that nVidia took here is not reflected in any of the twenty-three examples. RT 1038–1040, 1114. Mr. Wagner acknowledged another fundamental flaw in using this metric—he could not add the Transaction to his chart of twenty-three transactions using the same methodology used in those calculations because there was no acquisition price as there would have been in a merger. RT 1141. In light of these defects, the Court is unable to say this analysis starts with good data.[38]

---

**37.** To confirm the reasonableness of this approach, Mr. Wagner viewed the Project Titan Materials as indicating a value of $100 million for 75 engineers to equal $1.3 million/engineer. However, using his formula correctly, half this consideration is deemed to be the

technology so the correct engineer multiple would be $667,000.

**38.** Mr. Wagner also acknowledged that seventeen of the twenty-three mergers or acquisitions in his list had taken place prior to what

Third, does this analysis employ a reliable method? There are obvious weaknesses in such rules of thumb which Mr. Wagner admitted at trial. He acknowledged that there is usually no credible evidence as to how such rules were developed or how well they actually comport to actual transaction data. Mr. Wagner also agreed that this approach should rarely be used without other more reliable valuation methods. RT 1136.

Mr. Murphy, nVidia's investment banking expert, shared these criticisms. He called such metrics fundamentally unsound and unreliable because the data points in them are based on assumptions rather than hard numbers. Ex. BY, ¶¶ 23–24. Mr. Murphy also pointed out that use of the metric is analytically unsound because the metric imputes value to something (a person) that is inherently unsalable, and to which no discernible revenue streams are attributable. Ex. BY, ¶¶ 25–27; Ex. AC, pp. 7–9. The Court agrees with Mr. Murphy's criticisms.

Fourth, does the method produce a reliable result? Is there too great an analytical gap between the data and the conclusion? *See Joiner,* 522 U.S. at 146, 118 S.Ct. 512. Could this metric be used to predict an acquisition price for the 3dfx business or business unit that lines up with a market test or any of the indications of value one gleans from its SEC filings? Based on the roughly 2 50 engineers 3dfx employed at the time of the Transaction, using this metric, the predicted acquisition price for 3dfx would have been an astonishing $625 million using what Mr. Wagner described as the risk adjusted price-per-engineer of $1.25 million rather than the average price-per-engineer of $2.36 million. ($1.25 million × 250 × 2 = company

value of $625 million.) Using the $2.36 million average price per engineer leads to a company value of more than $1 billion! ($2.36 million × 250 × 2 = company value of $1.18 billion.). RT 1141–1144; RT 1238. Indulging Mr. Wagner's own premise that 100 engineers is the correct number, the metric leads to a company value of $250 million. ($1.25 million × 100 × 2 = company value of $250 million.)

If the metric is to value the technology transferred by reference to the number of engineers that developed it, what is the connection between the market value of the technology and the number of engineers—why does it range from $250,000 to $13 million? Mr. Wagner offered no clear explanation. RT 1131–1134.

The result reached by using this metric is hard to square with Mr. Wagner's own conclusion that 3dfx had no going concern value (RT 1220), and is harder to square with the results reached by his other approaches to valuation ($108–114 million, $151 million). It is simply impossible to square with real market test that took place here.

■ The best way to determine value is exposure to a market. *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle St. Partnership,* 526 U.S. 434 at 457, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). 3dfx management and its highly praised investment bank diligently explored all reasonable avenues for finding any potential parties interested in a transaction with 3dfx. Via offered $40 million, and nVidia offered $70 million in Cash Consideration. These are objectively reasonable indications of the value of what was transferred. To disturb this in favor of Mr. Wagner's ultimately unreliable met-

is generally understood to have been the point at which the internet bubble burst earlier in

2000. RT 929.

ric and its dubious conclusion, formed only on the basis of hindsight, would be dangerous and the Court will not do so.

## IV. Conclusion

Prior to the APA, 3dfx employed approximately 650 people of whom approximately 265 were engineers. Some of these engineers designed graphics chips and 3dfx incorporated those chips into its own add-in boards. After the STB merger in mid-1999, 3dfx sold only this board product. By the fall of 2000, by its own admission, 3dfx had run out of cash and was faced with the prospect of shutting down in mid-December whether or not it did the deal with nVidia. A premier investment bank conducted an extensive market search for a partner, an investor, or a purchaser, during a difficult time in the semiconductor industry. Only two offers emerged—one for approximately $40 million from Via and nVidia's far higher offer. 3dfx chose nVidia's offer to purchase designated tangible and intangible assets as documented in the APA and announced it was closing its doors. nVidia hired approximately 100 of the 265 engineers who were soon to be unemployed.

This sequence of events does not transform the asset purchase into the purchase of a business or business unit. nVidia's accounting for the Transaction does not transform the asset purchase into the purchase of a business or business unit.

On this record, there is no basis upon which the Court may find that the Transaction involved the transfer of a graphics business or business unit. Nor is there a basis upon which the Court may find that it involved the transfer of a workforce, together with, or separate from the business that employed it or the technology it developed

The Trustee's valuation theory—every way it is articulated—is simply not credible. The Trustee has not provided an objectively reasonable valuation of the assets involved in the Transaction done in accordance with applicable law and valuation principles. The Court will not approach whatever valuation exercise is required here by assigning a value to each engineer—whether that engineer is viewed as a proxy for technology or know-how or goodwill or merely as an engineer. On this record, the Court will defer to the market for the best evidence of the value of what was transferred. Whether it is described as a *business* because nVidia simultaneously acquired intellectual property and hired engineers who are viewed as able to work with that intellectual property, or it is described as a collection of *assets*, there is no credible evidence of value other than the one disclosed by the market. The price nVidia agreed to pay and 3dfx agreed to accept after arms' length negotiations by sophisticated well-represented parties who were well-informed regarding the market that existed at the time is a better gauge than a theoretical value crafted only in hindsight.

As to the first and second questions posed by the parties for trial, the answers are: the Transaction transferred the Specified Assets defined in the APA § 1.1(a)-(i) and the parties agreed to settle the Patent Litigation. The Transaction did not involve the transfer of a graphics business, business unit, engineers (as people), or a workforce. The access to recruit the engineers, and any information provided by 3dfx or assistance provided by 3dfx in connection with that process is not something subject to avoidance in this context. The employees are not an intangible asset, or a proxy for economic goodwill or any other intangible asset.

■ As to the third and fourth questions, the answers are: The evidence pre-

sented at trial established that the objectively reasonable fair market value of the Specified Assets was $30,742,500. This total is made up of $2,432,500 for Inventory, Equipment and Other Tangible Assets, $11,310,000 for Trademarks, $5 million for the Intellectual Property Assets, and $12 million for the settlement of the Patent Litigation. The $70 million in Cash Consideration paid by nVidia was more than the reasonably equivalent value for what it acquired in the Transaction. The evidence supports a conclusion that nVidia paid this sum for its own strategic reasons. The creditors of 3dfx were not injured by the Transaction.

The Court will issue a separate order consistent with this decision.